IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

CASE NO. 11-70003
_____

RICHARD COBB,
Petitioner-Appellant,

v.

RICK THALER, DIRECTOR TEXAS DEPARTMENT
OF CRIMINAL JUSTICE, INSTITUTIONAL DIVISION,
Respondent-Appellee.

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
_____

MOTION FOR ADDITIONAL CERTIFICATE OF APPEALABILITY
_____

PHILLIP C. UMPHRES                F. CLINTON BRODEN
Law Office of Phillip C. Umphres   Broden & Mickelsen
2600 State Street                  2600 State Street
Dallas, Texas 75204                Dallas, Texas 75204
214-999-0035                       214-720-9552
214-999-0037 (fax)                 214-720-9594 (fax)

Attorneys for Appellant
Richard Cobb

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualifications or recusal.

**District Court Judge:**               David Folsom

**Counsel for Petitioner in**           F. Clinton Broden
**District Court:**                      Phillip C. Umphres
                                         Adrienne Dunn
                                         Scott Hacker

**Appellate Counsel for Petitioner:**   F. Clinton Broden
                                         Phillip C. Umphres

**Petitioner:**                          Richard Cobb

**Counsel for Respondent**              Laura Grant Turbin
**in District Court:**

**Appellate Counsel for Respondent:**   Laura Grant Turbin

**Respondent:**                          Rick Thaler


                                         /s/ F. Clinton Broden
                                         F. Clinton Broden

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS..........................................................i

TABLE OF CONTENTS...............................................................................ii

TABLE OF AUTHORITIES...........................................................................iv

INTRODUCTION........................................................................................1

LEGAL BACKGROUND...............................................................................2

FACTUAL BACKGROUND.............................................................................4

    I. Guilt/Innocence...............................................................................4

    II. The Punishment Phase...................................................................13

        A. The State's Case.................................................................13

    III. The Hearing on the Motion for New Trial..................................21

    IV. The Hearing on the State Application for Habeas Relief.........................23

ARGUMENT...........................................................................................26

    I. The Texas Death Penalty Scheme is Unconstitutional Because it is Founded on a Jury's Inability to Predict Future Dangerous in Violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.......................................................................................26

    II. The Trial Court Relieved the State of its Constitutional Burden of Proving the Lack of Mitigating Circumstances Beyond a Reasonable Doubt.............28

    III. The Texas Death Penalty Scheme is Unconstitutional Because of its Failure to Provide Proportionality Review.......................................................30

CONCLUSION.................................................................................................34

CERTIFICATE OF SERVICE.....................................................................35

# TABLE OF AUTHORITIES

## Cases

*Apprendi v. New Jersey,* 530 U.S. 466 (2000)...............................................28, 29, 30

*BMW of North America, Inc. v. Gore,* 517 U.S. 559 (1996)......................................32

*Cobb v. State,* No. 74,875 (Tex. Crim. App. Jan. 31, 2007).......................................2

*Coleman v. Thompson,* 501 U.S. 722 (1991)...........................................................28,33

*Daniels v. United States,* 532 U.S. 374 (2001)......................................................28,33

*Exxon Shipping Co. v. Baker,* 128 S.Ct. 2605 (2008)...................................................33

*Ex Parte Cobb,* No. 68,19201 (Tex. Crim. App.)........................................................2

*Ex Parte Cobb,* No. 68,192-01; 68,192-02 (Tex. Crim. App. Dec. 5, 2007)..............2

*Flores v. Johnson,* 210 F.3d 456 (5th Cir. 2000).........................................................27

*Furman v. Georgia,* 408 U.S. 238 (1972)....................................................................31

*Honda Motor Co., Ltd.v. Oberg,* 512 U.S. 415 (1994)................................................32

*Jurek v. Texas,* 428 U.S. 262 (1976)...........................................................................27

*Kansas v. Marsh,* 548 U.S. 163 (2006).......................................................................31

*Livingston v. State,* 565 So.2d 1288 (Fla. 1988)........................................................31

*Martinez v. Johnson,* 255 F.3d 229 (5th Cir. 1999)...............................................28,33

*Miller-El v. Cockrell,* 537 U.S. 322 (2003)................................................................26

*Pulley v. Harris,* 465 U.S. 37 (1984).....................................................................30,31

*Ring v. Arizona,* 536 U.S. 584 (2002)..........................................................................29

*Roper v. Simmons,* 543 U.S. 551 (2005)................................................................31, 32

*Rowell v. Dretke,* 398 F.3d 370 (5th Cir.), *cert. denied,* 546 U.S. 848 (2005).............29

*Scheanette v. Quarterman,* 482 F.3d 815 (5th Cir. 2007)............................................29

*State v. Dixon*, 283 So.2d 1 (Fla. 1973).......................................................................31

*Tillman v. State*, 591 So.2d 167 (Fla. 1991)................................................................31

*United States v . Bajakajian,* 524 U.S. 321 (1998)......................................................33

*United States v. Sampson,* 335 F. Supp. 2d 166 (D. Mass. 2004)...............................27

## Statutes

Ala. Code § 13A-5-53(b)(3)........................................................................................30

Del. Code Ann. tit. 11 § 4209(g)(2)(a)........................................................................30

Ga. Code Ann. § 17-10-35(c)(3)..................................................................................30

Ky. Rev. Stat. Ann. § 532.075(3)c..............................................................................30

La. Code Crim. Proc. Ann. art.905.9...........................................................................30

Miss. Code Ann. § 99-19-105-(3)c..............................................................................31

Mo. Ann. Stat. § 565.035(3)........................................................................................31

Mont. Code Ann. § 46-18-310c....................................................................................31

Neb. Rev. Stat. §(3); (3)..............................................................................................31

Nev. Rev. Stat. § 177.055(2)(d)...................................................................................31

N.H. Rev. Stat. Ann. § 630:5310c.................................................................31

N.J. Stat. Ann. § 630:5.XIc.......................................................................31

N.M. Stat. Ann. § 31-20A-4C....................................................................31

N.Y. Crim. Proc. Law § 470.30.3c..............................................................31

N.C. Gen. Stat. § 15A-2000(d)(2)...............................................................31

Ohio Rev. Code Ann. § 2929.05(A)............................................................31

S.C. Code Ann. § 16-3-25(c)(3).................................................................31

S.D. Codified Laws § 23A-27A-12(3).........................................................31

Tenn. Code Ann. § 39-13-206(2)(c)(1)(D)...................................................31

Va. Code Ann. § 17.1-313(C)(2)................................................................31

Wash. Rev. Code Ann. § 10.95.130(2)(b)...................................................31

# **INTRODUCTION**

The district court granted Mr. Cobb a Certificate of Appealability on one issue – whether the state violated *Brady v. Maryland* when it withheld evidence that could have been used to impeach the credibility of state witness William Elmer Thomsen. Mr. Cobb now asks this Court to grant him a Certificate of Appealability on three additional issues.

## LEGAL BACKGROUND

Mr. Cobb was convicted of capital murder and sentenced to death in the 2nd District Court of Cherokee County, Texas on January 16, 2004. (CR at 448)[1] In an unpublished written opinion, the Texas Court of Criminal Appeals affirmed his conviction and sentence. *Cobb v. State*, No. 74,875 (Tex. Crim. App. Jan. 31, 2007).

Mr. Cobb applied for a Writ of Habeas Corpus to the Texas Court of Criminal Appeals on May 11, 2006. *Ex Parte Cobb*, No. 68,192-01 (Tex. Crim. App.). On April 13, 2007, Mr. Cobb filed an addendum to his application. In a *per curiam* order, the Texas Court of Criminal Appeals denied Mr. Cobb's application and dismissed the addendum as an abuse of writ. *Ex Parte Cobb*, No. 68,192-01; 68,192-02 (Tex. Crim. App. Dec. 5, 2007).

On December 4, 2008, Mr. Cobb filed his Application for Writ of *Habeas Corpus* pursuant to 28 U.S.C. § 2254 in the United States District Court for the Eastern District of Texas. (Docket Entry # 12) The district court denied Mr. Cobb's request in all respects in a Memorandum Opinion dated February 15, 2011. (Docket Entry # 21) Formal judgment dismissing the petition was also entered on February 15, 2011. (Docket Entry # 20)

Mr. Cobb filed a timely notice of appeal on March 16, 2011. (Docket Entry #

---

[1] "CR" represents the Clerk's Record from the state trial court.

25)   On March 23, 2011, the district court granted Mr. Cobb's Motion for a Certificate of Appealability in part allowing him to appeal the issue of whether the state violated *Brady v. Maryland* when it withheld evidence that could have been used to impeach the credibility of state witness William Elmer Thomsen. Nevertheless, the District Court denied a Certificate of Appealability as to all of the other issues raised in Mr. Cobb's Application.  (Docket Entry #27)

# FACTUAL BACKGROUND

## I.  Guilt/Innocence

Most of the facts presented by the state during the guilt/innocence phase of trial were conceded by the defense.  Where the defense's and the prosecution's theories diverged was on the issue of duress.

Richard Aaron Cobb was an eighteen years old in September of 2002.  While at Rusk High School, he began to hang around Beunka Adams whom he initially met in the ninth grade.  (RR 90:34-35)[2]  Adams proved to be a terrible influence on Mr. Cobb.  While both boys engaged in criminal behavior as juveniles, it was Adams who introduced the crime of aggravated robbery to Mr. Cobb.  (RR 90:36)  Adams told Mr. Cobb that armed robbery was the easiest money he could make.  (RR 90:37)  Mr. Cobb's adoptive parents (Paul and Elaine Cobb) had been experiencing severe financial difficulties.  (RR 90:40)  Paul was diagnosed with asbestos cancer and emphysema, causing him to quit his job.  (RR 90:38)  After that, the family could no longer afford its home and were forced to declare bankruptcy.  (RR 90:41)  Mr. Cobb tried to sell cocaine for money but quickly got into debt with a drug dealer.  (RR 90:41-42)  Adams suggested that Mr. Cobb join him in armed robbery.  (RR 90:42)

---

[2]  "RR" refers to the transcript of Mr. Cobb's trial.

Adams and Mr. Cobb committed two armed robberies in August 2002. (RR 90:45) The first robbery was at the Roadrunner in Jacksonville and the second was at the Conoco in Jacksonville. (RR 90:44) Adams supplied the gun and Mr. Cobb used his mother's car. (RR 90:42) Adams stayed in the car while Mr. Cobb ran inside the stores to commit the robberies. (RR 90:44) After these two robberies, Mr. Cobb suggested they sell the gun used in the robberies, but Adams rejected the idea, stating that the gun was needed for one more robbery. (RR 90:46)

The following week, Mr. Cobb used cocaine often and drank alcohol and smoked marijuana daily while sleeping only four-five hours per night. (RR 90:45) On September 2, 2002, Adams talked about robbing another store. (RR 90:47) Adams told Mr. Cobb to get a mask because they were going to rob BDJ's that night. (RR 90:48)

BDJ's was within walking distance through a wooded area from Adams' house. Adams decided that both he and Mr. Cobb would enter the store, Mr. Cobb would carry the gun and he would demand the money. (RR 90:49) After the robbery, the two men would walk back to Adams' house through the cover of the woods. (RR 90:49)

When they arrived at BDJ's, Mr. Cobb recognized a car parked in the front as that of his preacher. (RR 90:51) Mr. Cobb told Adams that they should not rob a

preacher. (RR 90:51) Adams walked towards the store to see who was inside. (RR 90:51) He came back to Mr. Cobb and reported that there were only two girls in the store. (RR 90:51) Mr. Cobb told Adams that he did not want to go into the store, but Adams was persistent. (RR 90:51) Adams put on the mask and a pair of gloves and Mr. Cobb used a bandana to cover his face and one glove and shirt sleeve to cover his hands. (RR 90:51)

At this point, Adams changed the plan. He told Mr. Cobb that, instead of getting away on foot, he would get the keys to the car parked out front and use that car as their getaway. (RR 90:53) They both walked into the store, but neither of them said anything, so Mr. Cobb said "freeze" or "give me the money." (RR 90:53) Once inside, Adams spotted Kenneth Vandever and ordered him to stand beside the girls behind the counter. (RR 90:54) Adams took the money from the register. (RR 86:70) Adams demanded the keys to the car parked out front. (RR 90:54) Candace Driver said it was her car and went to retrieve the keys from her purse. (RR 90:54) Adams again changed the plan and told the three hostages that they were going for a ride with them. (RR 90:54)

When they approached the car, Adams took the gun from Mr. Cobb. (RR 90:56) Adams gave out seating assignments: Adams was to be the driver, Nickie Ansley Dement would sit in the front passenger seat, and the three others would all

sit in the backseat.  (RR 90:56)  As soon as Adams got in the front seat, he passed the gun back to Mr. Cobb.  (RR 90:56)

As he was driving, Adams took his mask off and began talking to Nickie.  (RR 90:57-58)  Nickie recognized Adams from school but, at that time, was unsure of his name.  (RR 86:77)  Adams told Nickie that he was stealing money for his kids.  (RR 86:74)  Adams said that he and Mr. Cobb were driving to meet with friends, but Mr. Cobb had never heard of this part of the plan.  (RR 90:57)  Adams drove through a few country roads eventually stopping at a remote place nicknamed the "pea patch." (RR 90:59)

Once at the pea patch, Adams ordered the two women and Kenneth out of the car and into the trunk.  (RR 90:61-62)  Candace said that they could not all fit in the trunk.  (RR 90:63)  Adams threatened them with the gun, saying that, if they did not get into the trunk, he was going to take them out to the pasture.  (RR 90:64)  Adams then dislodged a shell and Candace started to cry.  (RR 90:64)  Candace and Kenneth climbed into the trunk.  (RR 90:64)

Adams, Mr. Cobb and Nickie started to walk towards the road.  (RR 90:64)  Adams still had the gun.  (RR 90:65)  All three walked towards the road and then started to walk back towards the car, but Adams pulled Nickie over into the bushes.  (RR 90:65)  Mr. Cobb took the gun from Adams and walked towards the car leaving

Adams and Nickie in the bushes. (RR 90:65) Adams told Nickie, "I want sex before we go." (RR 86:81) Adams removed Nickie's clothes and he sexually assaulted her. (RR 86:85-86) Adams then turned Nickie over onto her stomach. (RR 86:86) Nickie began struggling and saying "no." (RR 86:86) Adams told her, "Well, you can either do that or you can go down on me." (RR 86:86) Adams then grabbed Nickie's head and forced his penis into her mouth. (RR 86:86) After this, Adams pushed Nickie on the ground and vaginally penetrated her again. (RR 86:86) Adams then jumped up and said, "If you can't enjoy it then I can't enjoy it too much either." (RR 86:87) They put their clothes back on and then walked towards the car. (RR 86:87) Mr. Cobb was not present for the rape. (RR 86:87; 90:66)

Nickie and Adams returned to the car. (RR 90:72) By this time, Nickie recognized Mr. Cobb's face from school and knew she was friends with his older brother, but could not remember his name. (RR 86:84) Privately, Adams told Mr. Cobb that Mr. Cobb "should try to get some pussy." (RR 90:72) Mr. Cobb said "no." (RR 90:72)

Adams then released Candace and Kenneth from the trunk, but only for a few minutes. (RR 90:72) Shortly thereafter, Adams ordered Candace and Kenneth back into the trunk. (RR 86:87) Candace was crying and refused to get into the trunk again. (RR 86:87) Adams took the gun from Mr. Cobb, pointed it at her and cocked

it. (RR 86:87) Nickie asked Candace to do as Adams ordered. (RR 86:88) Candace and Kenneth returned to the trunk. (RR 86:88) Adams and Nickie walked towards the road again, while Mr. Cobb sat in the passenger seat of the car. (RR 90:74)

Adams and Nickie returned to the car. (RR 90:74) Adams asked Mr. Cobb why he was not talking. (RR 90:74) Adams also asked Mr. Cobb what he wanted to do with the hostages. (RR 90:74) Mr. Cobb suggested taking the car and leaving the hostages in the pea patch. (RR 90:74) Adams thought for a minute and then said, "There has been a change of plans." (RR 90:74) Adams opened the trunk and released Candace and Kenneth. (RR 90:74) Adams instructed the hostages to walk away from the car because he and Mr. Cobb were going to leave. (RR 90:74)

However, Adams changed his mind again. After the hostages began walking away, Adams told Mr. Cobb that they should be tied up. (RR 90:75; 86:90) Adams ordered the hostages to take their shirts off and he tore them up with his pocket knife. (RR 90:75) Adams tied up the hostages and instructed them not to move until they heard the car drive away. (RR 90:75) Kenneth said he needed to take his medicine. (RR 86:95)

Adams changed his mind again. Adams took the gun from Mr. Cobb and loaded the dislodged shell. (RR 90:76) Adams told Mr. Cobb that they were going to have to "off" the hostages. (RR 90:76) Mr. Cobb protested saying, "no, I can't do

it." (RR 90:76) With that, Adams handed the gun back to Mr. Cobb. (RR 90:78)

Mr. Cobb secretly turned the safety on and pretended that the gun was jammed. (RR

90:78) Adams took the gun, examined it, loaded it and then handed it back to Mr.

Cobb. (RR 90:78) Again, Mr. Cobb secretly turned the safety on and told Adams

that the gun did not work. (RR 90:78) Adams took the gun and fired it into the air.

(RR 90:78) Adams told Mr. Cobb that if only one of them does the shooting then

only one of them is leaving. (RR 90:79) Mr. Cobb took this as a viable threat

because Adams had previously told him that he had shot a person. (RR 90:79-80)

Adams handed the gun to Mr. Cobb. (RR 90:81) Mr. Cobb aimed the gun at

Kenneth, closed his eyes and fired. (RR 90:81) Kenneth screamed, "They got me."

(RR 86:96)

Adams grabbed the gun from Mr. Cobb and fired the second shot. (RR 90:82)

Both Nickie and Candace fell forward. (RR 86:82) Adams had shot Nickie in her

shoulder. (RR 86:97) Adams first ran to Candace and yelled, "Are you bleeding?"

(RR 90:82) Candace replied, "No, I'm not bleeding." (RR 86:97) Adams pointed

the gun directly at Candace's face and fired. (RR 90:82) Adams then turned his

attention towards Nickie. Adams asked Mr. Cobb if he hit Nickie, and Mr. Cobb

replied, "no." (RR 90:82) Adams kicked Nickie four to five times. (RR 90:82)

Nickie believed that both Adams and Mr. Cobb kicked her, but she only saw Adams

kicking.  (RR 86:99)  Mr. Cobb walked over to Nickie, held a lighter to her face and said, "She's dead."  (RR 90:82)

Adams and Mr. Cobb got in the car.  (RR 90:83)  Adams drove down several dirt roads, and Mr. Cobb tossed the gun into the woods.  (RR 90:84)  After driving for a few minutes, they abandoned the car, and Adams decided they would walk to Mike Hackett's and Lakale Brown's house.  (RR 90:84)

Once at Mike's and Lakale's, Adams asked for a ride to his cousin's house in Jacksonville.  (RR 90:85; 87:172; 87:182)  On the route, they drove past the BDJ's, and Adams told Mr. Cobb to duck down in the backseat.  (RR 90:86; 87:173)

Both Nickie and Candace survived.  Nickie walked to the first house she spotted and asked for help.  (RR 86:102)  Candace ran to the first house she saw, but no one answered the door.  (RR 88:120)  Candace then went to the next house and asked to call the police.  (RR 88:121)

The morning of September 3, 2002, the police had an arrest warrant for Beunka Adams, and, based on the information provided by Mike Hackett and Lakale Brown, the police believed Adams was in a house in Jacksonville.  (RR 88:68-69)  When the police arrived at the house, they spotted Adams and Mr. Cobb outside.  (RR 88:71)  Officer John Page yelled, "Stop, police."  (RR 88:72)  Adams and Mr. Cobb started to walk away at a brisk pace and then ran into the house.  (RR 88:72)  Page entered

the house and ordered Adams and Mr. Cobb into the front room. (RR 88:75) Adams walked from the back room into the front room first, followed by Mr. Cobb. (RR 88:75) Adams was easily arrested, but, according to Page, Mr. Cobb resisted arrest. (RR 88:82; 88:77-81) Mr. Cobb, however, testified that he did not resist arrest and that the police brutalized him during the arrest. (RR 90:104-105)

On rebuttal, the state presented William Elmer Thomsen, a former cell-mate of Mr. Cobb, to refute Mr. Cobb's defense of duress. (RR 91:48) Thomsen testified that Mr. Cobb told him of the other armed robberies Mr. Cobb and Adams had committed. (RR 91:48) Thomsen also testified that Mr. Cobb told him that he and Adams intended to rob a Whataburger before they got arrested. (RR 91:49) Most damaging, Thomsen testified that Mr. Cobb told him that, as a defense to the capital murder charge, he intended to falsely blame it on Adams and say that Adams had threatened him. (RR 91:50) Thomsen claimed that he had not received any benefit from the prosecution in exchange for his testimony. (RR 91:52) Thomsen further testified that, at the time he contacted the District Attorney, his charge of being a felon in possession of a firearm had already been dismissed but that he was still in jail awaiting resolution of his parole violation charge. (RR 91:51) Thomsen's parole was eventually revoked, and he remained incarcerated until May 2003. (RR 91:51-52) The jury rejected Mr. Cobb's defense of duress and convicted him of capital murder.

## II.  The Punishment Phase

### A.  The State's Case

The state's evidence at the punishment phase fell into five general categories: (1) victim impact testimony; (2) reputation evidence; (3) evidence of prior crimes committed by Mr. Cobb; (4) the testimony of William Thomsen; and (5) expert testimony related to Mr. Cobb's risk of future dangerousness.

Nickie Dement explained the physical pain she suffered while healing from her wounds.  (RR 93:8-17)  She also described the emotional toll this crime had on her, including sleeping disorders, flashbacks and depression.  (RR 93:24-26)  Further, Nickie's surgeon and home health nurse explained her medical conditions.  (RR 93:28-47)

The father of Kenneth Vandever told the jury how Kenneth suffered massive brain damage due to a car accident when Kenneth was nineteen.  (RR 94:163)  Since the accident, Kenneth sustained permanent brain damage that caused his short-term memory to fail.  (RR 94:164-65)

Ronnie Miller, Roy Cavazos, John Page, Jonathan Rhodes, and Darrell Atwood testified that Mr. Cobb had a bad reputation for peacefulness.  (RR 93:50; 93:52; 93:67; 93:111; 94:171)

Jacksonville Police Officer Page testified that he investigated a robbery at

Roadrunner on August 27, 2002 and a second robbery at Exxon/Chevron on August 30, 2002. (RR 93:54) Further, the jury viewed the surveillance video from the robbery at Chevron. (RR 93:71)

Joe Strickland testified that his weekend home in Cherokee County was burglarized in 1999 by Mr. Cobb and his brothers. (RR 93:114) Strickland pulled a gun on the boys and made them lay on the ground until the sheriff arrived. (RR 93:116) Strickland testified that Mr. Cobb showed no fear and expressed no remorse. (RR 93:116, 117)

Beunka Adams' brother, Dakedrion Tucker, testified that, one day while he was in his bedroom, Mr. Cobb and Trent O'Neil came into his room. (RR 93:120) Mr. Cobb was carrying a knife, but O'Neil attacked Dakedrion. (RR 93:122)

Mr. Cobb's juvenile probation officer, Darrell Atwood, testified that Mr. Cobb did not want to participate in boot camp and did not comply with probation. (RR 94:170)

William Elmer Thomsen, the jailhouse witness, testified again. He explained that Mr. Cobb told him that he was mad that Nickie and Candace survived because otherwise he would probably not be in jail. (RR 94:124) Thomsen claimed that Mr. Cobb told him that he got a rush out of shooting Kenneth. (RR 94:125) Thomsen further testified that Mr. Cobb told him that, if given the chance again, he would do

the same thing. (RR 94:126) Finally, Thomsen stated that Mr. Cobb expressed a desire to escape. (RR 94:126) During Thomsen's testimony, Mr. Cobb shouted, "you lying son-of-a-bitch. I never said no such thing." (RR 94:125)

Dr. Tynus McNeel, a psychiatrist, opined that there is better than a 50/50 chance that Mr. Cobb is likely to commit future acts of violence regardless of where he is. (RR 93:96) Dr. McNeel explained that the best indicator of future violence is past violence, and each episode of violence increases the potential future risk. (RR 93:97) Further, Dr. McNeel testified that another risk factor is the combination of personality disorder and substance abuse. (RR 93:97) Without ever examining Mr. Cobb, Dr. McNeel testified that Mr. Cobb probably has anti-social personality disorder. (RR 93:99)

A.P. Merillat is a criminal investigator with the Special Prosecution Unit in Huntsville. (RR 94:139) He told the jury that it is possible for an inmate to commit crimes of violence while housed in the Texas prison. (RR 94:146) Merillat also testified that there have been instances in which inmates convicted of capital murder escaped from Texas prisons. (RR 94:148)

### B. The Defense Case

Richard Cobb was one of five children born to Amy Reeder. Amy's children, in birth order, are: Nicholas, Michelle, Luke, Richard, and William. (RR 95:34)

Amy drank alcohol excessively and used drugs during all of her pregnancies and while breast-feeding.  (RR 95:36)  Amy would often leave the children alone in the house for days at a time.  (RR 95:39)  Nicholas, the eldest child, was left alone with the rest of the children so many times he could not remember the first time.  (RR 95:44)  Nicholas remembers having to listen to his mother have sex with different men nearly every night.  (RR 95:45)

In 1986, CPS became involved with Amy and her children.  (RR 94:177)  CPS required that Amy take her children to Kinder Kare for daycare.  (RR 95:18)  When the children arrived at the Kinder Kare, they were neglected, hungry, bruised, and underweight.  (RR 95:19)  Mr. Cobb was less than three years old at the time.  (RR 95:19)  Amy would often come to collect the children drunk, and the day care worker, Kathryn Martin Ashley, would refuse to allow her to take the children.  (RR 95:20)  Once, when Amy failed to pick up the children at the day care, Ashley drove the children to Amy's house and found William, the youngest child, abandoned in the home.  (RR 95:22)  William was alone in a crib covered with roaches.  (RR 95:22)

Eventually, Amy's rights as a parent of Michelle, Luke, Richard, and William were terminated.  Luke, Richard and William were adopted by Elaine and Paul Cobb when Richard was three years old.  (RR 95:2)  When the boys began living with the Cobbs, they were starved and would horde food.  (RR 94:179)  Before the adoption

16

was complete, Amy had visitation rights. After her visits, the children would lock the doors and ask if they could move to another house because they feared Amy. (RR 94:180) Elaine Cobb described a time when Amy was visiting and she saw Amy licking the boys in their bed. (RR 94:182) That was the last time Amy was permitted to visit. (RR 94:182)

Mr. Cobb did not see Amy again until two years before his trial. (RR 94:183) As an adult, Nicholas, the eldest, was trying to reunite with his brothers. (RR 94:183) Nicholas asked Mr. Cobb if he wanted to visit Amy. (RR 94:183) Luke and Mr. Cobb reluctantly agreed. They met Amy at her apartment in Dallas. (RR 94:183) Amy told Mr. Cobb that the man he thought was his father was not and, therefore, that none of his brothers were his full brothers. (RR 94:184) Mr. Cobb was sixteen at the time. (RR 94:184)

When Mr. Cobb was in the seventh grade, he was sent to boot camp for disciplinary problems. (RR 96:153) He failed to complete the program the first time but was successful the second time. (RR 96:153)

In 1996, Paul Cobb was diagnosed with asbestosis cancer. (RR 94:185) Paul's lung collapsed and he lived the last seven years of his life with only one-third of his lung. (RR 94:184) The same year Paul was diagnosed with cancer, Elaine's mother and brother died. (RR 94:185) Elaine testified that this affected Mr. Cobb deeply.

(RR 94:185)

Elaine testified that William was the child that gave her the most trouble. (RR 95:6) William reported hearing the voice of the devil and was diagnosed with bi-polar. (RR 95:5, 16) In fact, William's behavior was so bad that the Cobbs had to send Mr. Cobb to live with his grandparents for a short while so that the Cobbs could focus all their attention on William. (RR 95:16)

In the summer of 2002, Elaine noticed that Mr. Cobb began to act moody. (RR 94:186) He stayed out late and spent a lot of time with Buenka Adams. (RR 94:186) During this time, Mr. Cobb was using cocaine heavily – some 100-200 times. (RR 96:170) The night before Mr. Cobb was arrested, he used crack for the first time. (RR 96:170)

By the time of Mr. Cobb's trial, his family life had altered tremendously. Paul Cobb died of cancer while Mr. Cobb was in jail awaiting trial. (RR 94:188) Luke was diagnosed with paranoid schizophrenia and was hospitalized in the Rusk State Hospital. (RR 94:189-90) Nicholas, the eldest and the one brother not adopted by the Cobbs, was paroled from prison a few months before the trial and was addicted to marijuana. (RR 95:48-49) William continued to suffer from bi-polar. (RR 95:16)

During his testimony at the punishment phase of the trial, Mr. Cobb expressed remorse for the murder of Kenneth. (RR 96:152) He testified that he felt emptiness

about killing Kenneth. (RR 96:152) Mr. Cobb's testimony contradicted Thomsen's testimony. Mr. Cobb refuted Thomsen's statement that he said that he had gotten a rush out of killing Kenneth. (RR 96:151) Mr. Cobb testified that he never told Thomsen that he planned to rob the Whataburger. (RR 96:157) Mr. Cobb also denied telling Thomsen that he wanted to escape. (RR 96:158) Thomsen arrived at the jail after Mr. Cobb was incarcerated and, by that time, he had been aware of many of the facts of Mr. Cobb's crime (RR 96:160) Mr. Cobb was upset and spent much of the time crying. (RR 96:159) Thomsen would come into Mr. Cobb's cell to try to console him. (RR 96:159)

The defense also presented the expert testimony of Joan Mayfield and Seth Silverman.

Joan Mayfield is a neuropsychologist at Our Children's House at Baylor in Dallas. (RR 95:63) She evaluated Mr. Cobb twice and conducted a series of tests. (RR 95:65) Dr. Mayfield noted that Mr. Cobb suffered from several cognitive weaknesses, including deficits in attention, language, intellectual functioning, processing speed, reading comprehension and writing. (RR 95:66-72) Mr. Cobb also suffered from hyperactivity and an inability to make proper eye contact. (RR 95:74) However, once Mr. Cobb was placed on anti-depressant medication, his eye contact and attention improved. (RR 95:75) Because of his deficits, Mr. Cobb would have

trouble processing new information quickly. (RR 95:79) Dr. Mayfield opined that these deficits were consistent with fetal alcohol syndrome. (RR 95:78) As a consequence, Mr. Cobb displayed rather flat affect, meaning that he feels emotion but is unable to show it. (RR 95:80) Finally, Dr. Mayfield testified that, with medication, Mr. Cobb is more equipped to function in society. (RR 95:82)

Seth Silverman is a psychiatrist who conducted a risk assessment of Mr. Cobb. (RR 96:114) Dr. Silverman explained that conducting a risk assessment entails determining, with medical probability, the risk that an individual with certain similar characteristics will be categorized as a re-offender. (RR 96:114) Dr. Silverman opined that, applying these characteristics to Mr. Cobb, there is a less than fifty percent chance that he will re-offend. (RR 96:114) The special characteristics applicable to Mr. Cobb are his neurological damage, cognitive disorder caused by fetal alcohol and drug use, a history consistent with sexual abuse, prior criminal acts such as runaway, unauthorized use of an automobile, evading arrest, burglary of a coin machine, burglary of a habitation, burglary of a building, poor behavior in school, boot camp, and the fact that he committed three armed robberies and the murder in a few-week period. (RR 96:118-19) Dr. Silverman explained that, if Mr. Cobb's access to guns and drugs was limited and he was appropriately supervised, his risk of future violence would decrease significantly. (RR 96:122) Furthermore, if

Mr. Cobb were to be released on parole in forty years, the chance of reoffending would be extremely low because, at that time, he would be 60 years old. (RR 96:125) After hearing this evidence, the jury sentenced Mr. Cobb to death.

## III.  The Hearing on the Motion for New Trial

In the motion for new trial, Mr. Cobb alleged that the state withheld impeaching evidence from the defense.  Specifically, Mr. Cobb asserted that the prosecutor possessed letters regarding William Elmer Thomsen.  (CR Supp. at 6)

William House, lead counsel for Mr. Cobb, testified that, after the close of the punishment testimony, he received a copy of a letter written by the district attorney on behalf of Thomsen.  Further, House explained that, after the sentencing verdict, he received a copy of a letter written by Thomsen addressed to the district attorney. (RR 100:5; EX#2) In the letter, Thomsen wrote, "At our meeting in Mr. Hatch's office on 12-19-02 you agreed to completely clear this charge as well as try to have the parole hold lifted as I could get released."

The attorney for Thomsen, Forrest Phifer, testified that, at the request of his client, he contacted the district attorney.  (RR 100:7)  The district attorney scheduled a meeting with Thomsen, his attorney, and the investigator for the district attorney. (RR 100:7)  Phifer testified that, at this meeting, there were no deals made between Thomsen and the DA's office.  (RR 100:8)  Phifer explained that, at the time of the

meeting, Thomsen's case had been dismissed at the examining trial.  (RR 100:9)

Phifer explained that, as a defense attorney, he often requests an examining trial

because the district attorney does not show up at the hearing, and then the case is

dismissed.  (RR 100:10)  Phifer testified that this procedure happens in most of the

unindicted cases.  (RR 100:11)

Elmer Beckworth, the district attorney and lead prosecutor, testified next.  (RR

100:11)  He explained that it is his office's standard practice to dismiss a case set for

an examining trial because the office does not have the resources to attend the

examining trials.  (RR 100:13)  Later, if and after the office reviews the police reports

and decides to accept the case for prosecution, he will seek indictment during the next

grand jury meeting.  (RR 100:13)  According to Beckworth, Thomsen was arrested

for riding around in a four-wheeler with a gun.  (RR 100:13)  Beckworth testified the

police report stated that Thomsen said he had the gun for target practice.  (RR 100:13)

In Beckworth's experience, it is very difficult to get a conviction for a gun case, and

most of those he declines to prosecute.  (RR 100:14)  Beckworth testified that he

called Thomsen's parole officer and asked for leniency, but that this information was

provided to the defense prior to trial.  (RR 100:14)  On the morning of punishment

final arguments, after the evidence was closed, he became aware that the defense did

not have the letter he wrote on Thomsen's behalf and gave it to House.  (RR 100:14)

Beckworth testified that EX#1 (the letter Beckworth wrote on behalf of Thomsen) was found in the bottom of a drawer, and EX#2 (the letter Thomsen wrote to Beckworth) was mis-filed in Beunka Adams' file labeled "work product." (RR 100:17) Beckworth also testified that the defense never took the opportunity to review the state's entire file through the open file policy. (RR 100:19) Beckworth stated that, had the defense done so, he would have verified that only actual work product items were in the work product file. (RR 100:19) Beckworth explained that he found the letter in Adams' file while preparing for Adams' trial. (RR 100:15)

The court denied the motion. (RR 100:24)

## IV. The Hearing on the State Application for Habeas Relief

The state habeas court granted Mr. Cobb an evidentiary hearing. However, after the state habeas attorney learned that the trial judge was the brother of Forrest Phifer (Thomsen's attorney), Mr. Cobb filed a motion recusing the judge. The motion was granted, and the hearing was heard before Judge Bascom W. Bentley.

William House, Mr. Cobb's trial attorney, testified as to his experience with the undisclosed letters. After Mr. Cobb was sentenced to death, Beckworth gave him the letter Thomsen had written to Beckworth. (SHC RR 2:17) House explained that, although Beckworth labeled this letter as work product, he can think of no justification for doing so. (SHC RR 2:19) House considered Thomsen's testimony

to have been incriminating and material. (SHC RR 2:20)[3] House testified that, had he had the letters, he would have cross-examined Thomsen differently. (SHC RR 2:21) House opined that Thomsen left the false impression with the jury that there was no deal between him and the District Attorney because the letters imply that, at the very least, Thomsen thought there was a deal. (SHC RR 2:34, 28)

Elmer Beckworth again testified that the letter written by Thomsen was mistakenly placed in Adams' file. (SHC RR 2:93) Beckworth discovered the letter while preparing for Adams' trial. (SHC RR 2:93) Beckworth stated that, despite his requests that the defense come to his office and review the files, the attorneys for Adams did so but not the attorneys for Mr. Cobb. (SHC RR 2:94) Mr. Cobb was already in jail when Thomsen arrived. (SHC RR 2:97) Beckworth acknowledged that Thomsen knew that district attorney would be interested in information about Mr. Cobb. (SHC RR 2:97) Significantly, Beckworth admitted that, at the time that Thomsen wrote the letter, Thomsen obviously thought there was a deal. (SHC RR 2:100) But Beckworth explained that, by the time of the trial, Thomsen should have known there was no deal because his parole was revoked and he was sent to prison after talking with the district attorney. (SHC RR 2:100)

Beckworth testified that he did not refer Thomsen's gun case to the US

_____

[3] "SHC RR" is the transcript from the state habeas hearing.

Attorney because he believed the case did not fit the criteria of gun cases the US Attorney was looking for. (SHC RR 2:101) Also, Beckworth testified that, had he taken Thomsen's case to trial, he believed Thomsen would have had a 75-80% chance of an acquittal. (SHC RR 2:101)

James W. Volberding, a lawyer who represents five men on death row, also testified. (SHC RR 3:6) Volberding stated that, without Thomsen's letters, an effective cross-examination of Thomsen was impossible. (SHC RR 3:15)

# ARGUMENT

The standards for issuing a Certificate of Appealability under the Anti-terrorism and Effective Death Penalty Act ("AEDPA") require that "a petitioner must "sho[w] that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880 at 893, n. 4 (1983)).  As explained by the United States Supreme Court in *Miller-El*:

> We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for *habeas corpus*.  Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail.

*Id.* at 338.

## I.  The Texas Death Penalty Scheme Is Unconstitutional Because it Is Founded on a Jury's Inability to Predict Future Dangerous in Violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution

Central to the Texas death penalty scheme is the requirement that jurors, who are lay people, make a determination about the future dangerousness of a defendant.  Mr. Cobb argued at trial (CR 129) and in his 2254 motion that this scheme, because it requires jurors to make determinations of "dangerousness" that are beyond the skill and ability of even experts in the field of mental health, is unconstitutional.

As noted in the district court's Memorandum Opinion, this issue was decided against Mr. Cobb's position by the Supreme Court in *Jurek v. Texas*, 428 U.S. 262, 274-75 (1976). Nevertheless, this has not stopped "reasonable jurists" from suggesting that it is time for the Court to revisit that holding. For example, Judge Garza of this court, obviously a "reasonable jurist," wrote:

> The scientific community virtually unanimously agrees that psychiatric testimony on future dangerousness is, to put it bluntly, unreliable and unscientific. It is as true today as it was in 1983 that "[n]either the Court nor the State of Texas has cited a single reputable scientific source contradicting the unanimous conclusion of professionals in this field that psychiatric predictions of long-term future violence are wrong more often than they are right."

*Flores v. Johnson*, 210 F.3d 456, 463 (5th Cir. 2000) (Garza, J, concurring) (citations omitted). Similarly, Chief Judge Mark Wolfe of the United States District Court for the District of Massachusetts, presumably also a "reasonable jurist," agreed with Judge Garza and specifically noted that " it may now be appropriate for the Supreme Court to revisit *Jurek*." *United States v. Sampson*, 335 F.Supp. 2d 166, 218 (D. Mass. 2004).

In light of the fact that "reasonable jurists," including a member of this court, believe that *Jurek* should be revisited and that this issue is "adequate to deserve encouragement to proceed further" in order to preserve it for Supreme Court review, Mr. Cobb submits that he has met the standard required for the granting of a

Certificate of Appealability on this issue. <sup>4</sup>

## II.  The Trial Court Relieved the State of its Constitutional Burden of Proving the Lack of Mitigating Circumstances Beyond a Reasonable Doubt.

With regard to the mitigation special issue in this case, the jury was simply instructed that it could answer Special Issue No. 2 "yes" if ten or more jurors believed there were mitigating circumstances against a sentence of death or "no" if all jurors believed there were no mitigating circumstances against a sentence of death.  At no time was the jury instructed as to who had the burden of proof regarding the mitigating circumstances that might be considered in relation to Special Issue No. 2.

The United States Supreme Court, in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), held that the Due Process Clause of the Fourteenth Amendment and the right to trial by jury contained in the Sixth Amendment require that, when a jury is asked to make an assessment of facts that increase a defendant's penalty range, the jury must find such facts to be true or not true beyond a reasonable doubt before such an

---

<sup>4</sup>  The district court found this issue to be unexhausted but, nevertheless, considered it on its merits.  In any event, if this court was to agree that this claim was unexhausted, Mr. Cobb asserts that he is excused based upon the deficient performance of his habeas counsel in preserving the issue.  While Mr. Cobb acknowledges that this court has held that a person has no right to the effective assistance of counsel in a state habeas proceeding. (*see, e.g, Martinez v. Johnson,* 255 F.3d 229, 245 (5th Cir. 1999)), the United States Supreme Court considers this an "open" question.  *Coleman v. Thompson*, 501 U.S. 722, 755 (1991); *Daniels v. United States*, 532 U.S. 374, 387 (2001) (Scalia, J., concurring) (Acknowledging that the question of wether ineffective assistance of state habeas counsel can excuse a procedural was "left open" in *Coleman*).

increase in potential penalty is constitutionally permitted. Applying the logic of *Apprendi*, a jury should be required to find the lack of mitigating evidence beyond a reasonable doubt in order to increase a defendant's sentence from life imprisonment to death.

This argument also is supported by the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002). *Ring* involved a Sixth Amendment challenge to Arizona's judge-sentencing capital punishment scheme. The Supreme Court held that the Sixth Amendment to the United States Constitution requires that any finding of fact that makes a defendant eligible for the death penalty must be unanimously made by the jury beyond a reasonable doubt. *Ring*, 536 U.S. at 564.[5]

Nevertheless, Mr. Cobb concedes that his argument in this regard is foreclosed by this court's precedent in *Scheanette v. Quarterman,* 482 F.3d 815, 828 (5th Cir. 2007) and *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir.), *cert. denied*, 546 U.S. 848 (2005). Likewise, the majority in *Apprendi* noted that it "considered and rejected the

---

[5] While *Ring* dealt specifically with statutory aggravating circumstances and the defendant in that case made "no Sixth Amendment claim with respect to mitigating circumstances" (*Ring*, 536 S.Ct. at 597, n.4), it included "facts which manifest in order to subject the defendant to a legally prescribed punishment...put [a defendant] to death." *Id*. at 572, *citing, Apprendi,* 530 U.S. at 499. Because, if a jury finds sufficient mitigation exists, a defendant is no longer eligible for the death penalty under the Texas capital punishment scheme, mitigation is a factual issue "that . . . must be found by a jury beyond a reasonable doubt." *Ring*, 536 S.Ct. at 572. In effect, the lack of sufficient mitigating factors is "the functional equivalent of an element of [capital murder]." *See Apprendi*, 530 U.S. at 494.

argument that the principles guiding [its] decision...render invalid state capital sentencing schemes...." *Apprendi*, 530 U.S. at 496-97. Nevertheless, present and former members of the Supreme Court apparently believed that *Apprendi* could have an effect on capital sentencing schemes. *Id.* at 523 (Thomas, J., concurring); *id.* at 536-539 (O'Connor, J., dissenting). Therefore, Mr. Cobb raises this issue in order to preserve it in the event *en banc* and/or Supreme Court review becomes necessary.

## III. The Texas Death Penalty Scheme Is Unconstitutional Because of its Failure to Provide Proportionality Review.

At trial, Mr. Cobb moved the trial court to hold Article 37.071 of the Texas Code of Criminal Procedure unconstitutional because it fails to require comparative proportionality review. (CR at 154) Mr. Cobb also provided a memorandum in support of this motion. (CR at 193) The motion was denied. (CR at 327)

Mr. Cobb acknowledges that this claim is precluded by *Pulley v. Harris*, 465 U.S. 37 (1984). However, Mr. Cobb asserts that the legal landscape has changed since the Court's opinion in *Pulley* in 1984 such that proportionality review of capital cases should be required. Indeed, twenty-two of the thirty-eight states with the death penalty now require the state high court conduct an independent proportionality review of all capital cases.[6] Moreover, in light of Supreme Court decisions in more

---

[6] By statute in Ga. Code Ann. § 17-10-35(c)(3);Ala. Code § 13A-5-53(b)(3);Ky. Rev. Stat. Ann. § 532.075(3)c; Del. Code Ann. tit. 11 § 4209(g)(2)(a);La. Code Crim. Proc. Ann. art.

recent death penalty cases, as well as civil cases and forfeiture cases, it appears that *Pulley* is ripe for review.

As has been noted by Supreme Court justices, "the death penalty must be reserved for 'the worst of the worst.'" *Kansas v. Marsh,* 548 U.S. 163, 206 (2006) (Souter, J., dissenting). In determining that the death penalty is too arbitrarily imposed, Justice Brennan noted that it was "implausible that only the worst criminals or the criminals who committed the worst crimes are selected for this punishment." *Furman v. Georgia*, 408 U.S. 238, 294 (1972) (Brennan, J., concurring).

In keeping with the goal of executing only those that are of the most deserving, the Supreme Court, since *Pulley*, has continually narrowed the class of persons eligible for the death penalty. "Capital punishment must be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution'" *Roper v. Simmons*, 543 U.S. 551, 568 (2005) (quoting *Atkins v. Virginia*, 536 U.S. 304, 319 (2002)). In both *Roper* and *Atkins*, the Court acknowledged that the standards of decency had evolved

---

905.9; Miss. Code Ann. § 99-19-105-(3)c; Mo. Ann. Stat. § 565.035(3);Mont. Code Ann. § 46-18-310c; Neb. Rev. Stat. §(3); (3); Nev. Rev. Stat. § 177.055(2)(d); N.H. Rev. Stat. Ann. § 630:5310c; N.J. Stat. Ann. § 630:5.XIc; N.M. Stat. Ann. § 31-20A-4C; N.Y. Crim. Proc. Law § 470.30.3c; N.C. Gen. Stat. § 15A-2000(d)(2); Ohio Rev. Code Ann. § 2929.05(A); S.C. Code Ann. § 16-3-25(c)(3);S.D. Codified Laws § 23A-27A-12(3); Tenn. Code Ann. § 39-13-206(2)(c)(1)(D); Va. Code Ann. § 17.1-313(C)(2); Wash. Rev. Code Ann. § 10.95.130(2)(b) and by Florida case law, *Tillman v. State*, 591 So.2d 167 (Fla. 1991); *Livingston v. State,* 565 So.2d 1288 (Fla. 1988); *State* v. Dixon, 283 So.2d 1 (Fla. 1973).

to such the degree that the execution of child murderers and the mentally retarded could no longer be tolerated. *Roper,* 543 U.S. at 561 and *Atkins*, 536 U.S. at 311. In other words, a seventeen-year-old killer and a murderer suffering from mental retardation cannot possibly be "the worst of the worst" criminals. In reaching these conclusions, the Supreme Court engaged in proportionality review. *Roper*, 543 U.S. at 564-65 (comparing the laws of the execution of juvenile offenders); 575-78 (discussing that the US "is the only country in the world that continues to give official sanction to the juvenile death penalty") and *Atkins*, 536 U.S. at 314-15 (comparing the laws of the execution of the mentally retarded in various states); 316 n. 21 (discussing the disapproval over the execution of the mentally retarded in the world stage).

Apart from the capital punishment jurisdiction, the Supreme Court has conducted proportionality review in civil cases in which the amount of damages was at issue. In *Honda Motor Co., Ltd. v. Oberg*, 512 U.S. 415 (1994), the Supreme Court held that the Due Process Clause requires appellate review of jury awards of punitive damages. The Court applied this principle in *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996). The Court held that the punitive award assessed against BMW was grossly excessive because: "the degree of reprehensibility of [BMW's] nondisclosure; the disparity between the harm…and [*Gore*'s] punitive damages

award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Id.* at 575. After conducting such a comparison, the Court concluded that the jury award of $2 million was "substantially greater" than similar fines elsewhere. *Id.* at 583-84. *See also, Exxon Shipping Co. v. Baker*, 128 S. Ct. 2605, 2622-25 (2008) (comparing the laws of punitive damages awards in various states and nations).

The Court also used proportionality review when reviewing a forfeiture award in *United States v. Bajakajian*, 524 U.S. 321 (1998). There, the Court held the forfeiture award of the entire $357,144 that the defendant was carrying when he failed to report that he was transporting more than $10,000 in currency violated the Eighth Amendment's excessive fine clause.

In light of the change in the legal landscape since *Pulley*, Mr. Cobb submits that this issue is "adequate to deserve encouragement to proceed further." In other words, a Certificate of Appealability should be issued to preserve the issue for Supreme Court review.[7]

---

[7] The district court found this issue to be unexhausted but, nevertheless, considered it on its merits. If this court was to agree that this claim was unexhausted, Mr. Cobb asserts that he is excused based upon the deficient performance of his habeas counsel in preserving the issue. Mr. Cobb acknowledges that this court has held that a person has no right to the effective assistance of counsel in a state habeas proceeding. (*see, e.g, Martinez* 255 F.3d at 245), the United States Supreme Court considers this an "open" question. *Coleman* 501 U.S. at 755; *Daniels*, 532 U.S. at 387 (Scalia, J., concurring) (Noting that the question of wether ineffective assistance of state habeas counsel can excuse a procedural was "left open" in *Coleman*).

## CONCLUSION

For the foregoing reasons Petitioner Richard Aaron Cobb respectfully requests

that this Court grant him a Certificate of Appealability on the issues set forth above.

Respectfully submitted,

/s/ F. Clinton Broden
F. Clinton Broden
Broden & Mickelsen
2600 State Street
Dallas, Texas 75204
214-720-9552
214-720-9594 (facsimile)

Phillip C. Umphres
Law Office of Phillip C. Umphres
2600 State Street
Dallas, Texas 75204
214-999-0035
214-999-0037(facsimile)

Attorneys for Appellant
Richard Cobb

## CERTIFICATE OF SERVICE

I, F. Clinton Broden, certify that on May 12, 2011, I caused the foregoing document to be served by first class mail, postage prepaid, on Laura Grant Turbin, Office of the Texas Attorney General, P.O. Box 12548, Capitol Station, Austin, Texas 78711.

/s/ F. Clinton Broden
F. Clinton Broden

# CERTIFICATE OF COMPLIANCE

I, F. Clinton Broden, certify that

(1) this brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B) because this brief contains 8,461 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(a)(7)(B)(iii), and

(2) this brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Word for Macintosh in 14 pt. Times New Roman (12 pt for the footnotes).

/s/ F. Clinton Broden
F. Clinton Broden