# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

## CASE NO. 11-70003
_____

## RICHARD COBB,
**Petitioner-Appellant,**

v.

## RICK THALER, DIRECTOR TEXAS DEPARTMENT
## OF CRIMINAL JUSTICE, INSTITUTIONAL DIVISION,
**Respondent-Appellee.**

_____

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
_____

## OPENING BRIEF FOR THE APPELLANT
_____

**PHILLIP C. UMPHRES**
**Law Office of Phillip C. Umphres**
**2600 State Street**
**Dallas, Texas 75204**
**214-999-0035**
**214-999-0037 (fax)**

**F. CLINTON BRODEN**
**Broden & Mickelsen**
**2600 State Street**
**Dallas, Texas 75204**
**214-720-9552**
**214-720-9594 (fax)**

**Attorneys for Appellant**
**Richard Cobb**

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualifications or recusal.

**District Court Judge:**      David Folsom

**Counsel for Petitioner in**
**District Court:**      F. Clinton Broden
      Phillip C. Umphres
      Adrienne Dunn
      Scott Hacker

**Appellate Counsel for Petitioner:**      F. Clinton Broden
      Phillip C. Umphres

**Petitioner:**      Richard Cobb

**Counsel for Respondent**
**in District Court:**      Laura Grant Turbin

**Appellate Counsel for Respondent:**      Tomee Morgan Heining

**Respondent:**      Rick Thaler

/s/ F. Clinton Broden
F. Clinton Broden

## **STATEMENT REGARDING ORAL ARGUMENT**

This is a death penalty case, with the life of the Appellant Richard Cobb riding on the outcome of this appeal.  The single issue presented is fact-intensive.  Mr. Cobb believes that a discussion of the relevant facts and how they may have affected the death penalty decision at trial would materially aid the Court in reaching a decision in this case.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS..........................................................i

STATEMENT REGARDING ORAL ARGUMENT................................................ii

TABLE OF CONTENTS..............................................................................iii

TABLE OF AUTHORITIES...........................................................................v

STATEMENT OF JURISDICTION.................................................................1

STATEMENT OF THE ISSUE.......................................................................2

STATEMENT OF THE CASE........................................................................2

STATEMENT OF FACTS.............................................................................4

     I. The Guilt/Innocence Phase..............................................................5

     II. The Punishment Phase..................................................................13

          A. The State's Case..................................................................13

          B. The Defense's Case.............................................................16

     III. The late production of the critical letters and motion for new trial.............21

     IV. The Hearing on the State Application for Habeas Relief.........................27

     V. The Federal Habeas petition...........................................................29

SUMMARY OF THE ARGUMENT................................................................30

ARGUMENT AND AUTHORITIES...............................................................31

     I. Standard of Review.....................................................................31

II. Discussion of Mr. Cobb's Single Point of Error..........................................40

CONCLUSION.......................................................................................................54

CERTIFICATE OF SERVICE..............................................................................57

CERTIFICATE OF COMPLIANCE.....................................................................58

# TABLE OF AUTHORITIES

## Cases

*Bagley v. Lumpkin,* 798 F.2d 1297 (9th Cir. 1986)....................................................45

*Banks v. Thayer,* 583 F.3d 295 (5th Cir. 2009)...........................................................31

*Bower v. Quarterman,* 497 F.3d 459 (5th Cir. 2007)....................................................31

*Brady v. Maryland,* 373 U.S. 83 (1963)........................................29, 31, 43, 45, 54, 55

*Buckley v. Valeo,* 424 U.S. 1 (1976)...........................................................................33

*Cobb v. State,* No. AP-74,875 (Tex. Crim. App. Jan.31, 2007)..................................3

*Crater v. Galaza,* 508 F.3d 1261 (9th Cir. 2007)........................................................36

*Ex Parte Cobb,* No. 15,054-A.....................................................................................3

*Ex Parte Cobb,* No. 68,192-01; 68,192-02 (Tex. Crim. App. Dec. 5, 2007).......3, 29

*Evans v. Thompson,* 524 F.3d 1 (1st Cir. 2008)............................................................37

*Guidry v. Dretke,* 397 F.3d 306 (5th Cir. 2005)............................................................31

*Gutierrez de Martinez v. Lamagno,* 515 U.S. 417 (1995)...........................................35

*Kyles v. Whitley,* 514 U.S. 419 (1995).....................................................43, 44, 54, 55

*Lindh v. Murphy,* 521 U.S. 320 n. 7 (1997)................................................................38

*Lockyer v. Andrade,* 538 U.S. 63 (2003)....................................................................39

*Marbury v. Madison,* 5 U.S. (1 Cranch) 137 (1803)..............................................34, 37

*Middleton v. McNeil,* 541 U.S. 433 (2004)................................................................38

*Miller v. Dretke,* 431 F.3d 241 (5th Cir. 2005)...............................................................54

*Morrow v. Dretke,* 367 F.3d 309 (5th Cir. 2004)..........................................................54

*Murphy v. Johnson,* 205 F.3d 809 (5th Cir. 2000).........................................................32

*Penry v, Johnson,* 32 U.S. 782 (2001)...........................................................................32

*Plaut v. Spendthrift Farm, Inc.,* 514 U.S. 211 (1995).....................................................34

*Strickler v. Greene,* 527 U.S. 263 (1999)..............................................................43, 44

*United States v. Bagley,* 473 U.S. 667 (1985).................................................43, 45, 54

*United States v. Edwards,* 442 F.3d 258 (5th Cir. 2006)................................................31

*United States v. Klein,* 80 U.S. (13 Wall.) 128 (1872)...................................34, 35, 37

*United States v. Padelford,* 76 U.S. (9 Wall.) 531 (1870)...................................34, 35

*Wiggins v. Smith,* 539 U.S. 510 (2003).........................................................................39

*Williams v. Taylor,* 529 U.S. 362 (2000).............................................................36, 39

*Woodford v. Visciotti,* 537 U.S. 19 (2002)...................................................................38

*Yakus v. United States,* 321 U.S. 414 (1944)................................................................35

## **Statutes and Other Authorities**

28 U.S.C § 2253................................................................................................................2

28 U.S.C. § 2254.............................................................1,3, 31, 36, 37, 39, 40

Christopher Eisgruber & Lawrence Sager, Why the Religious Freedom Restoration Act is Unconstitutional, 69 N.Y.U. L. Rev. 437 (1994)..................................35

Henry M. Hart, Jr., The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 Harvard L. Review 1362 (1953)...........35

James S. Liebman & William F. Ryan, "Some Effectual Power": The Quantity and Quality of Decisionmaking Required of Article III Courts, 98 Columbia L. Review 696 (1998)...............................................................................................35

Tex. Code Crim. Proc. Art. 12.01 (6).........................................................................42

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

————————————————

CASE NO. 11-70003

————————————————

RICHARD COBB,
Petitioner-Appellant,

v.

RICK THALER, DIRECTOR TEXAS DEPARTMENT
OF CRIMINAL JUSTICE, INSTITUTIONAL DIVISION,
Respondent-Appellee.

————————————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS

————————————————————

BRIEF FOR THE APPELLANT

————————————————————

## STATEMENT OF JURISDICTION

This is an appeal from a final order of the U.S. District Court for the Eastern

District of Texas denying an application for a writ of habeas corpus filed under 28

U.S.C. §2254.  (Dkt 21)[1]  Upon application by Mr. Cobb, the District Court issued

a certificate of appealabilty on the single issue presented in this appeal.  (Dkt 27)

———————————————

[1]  "Dkt #" refers to the Docket Number of the referenced pleadings filed in the District
Court in the federal habeas case.

1

Accordingly, the Court of Appeals has jurisdiction under 28 U.S.C. § 2253.

## STATEMENT OF THE ISSUE

Did the district court err when it held the state did not violate Mr. Cobb's Fifth Amendment rights, as expressed in the rule of *Brady v. Maryland,* when it withheld evidence that could have been used to impeach the credibility of a key witness for the State?

## STATEMENT OF THE CASE

Mr. Cobb was convicted of capital murder and sentenced to death in the 2nd Judicial Court of Cherokee County, Texas on January 16, 2004. (CR at 448)[2] Mr. Cobb's conviction and sentence were automatically appealed to the Texas Court of Criminal Appeals (CCA). In an unpublished written opinion, the CCA affirmed the conviction and sentence. *Cobb v. State*, No. AP-74,875 (Tex. Crim. App. Jan.

---

[2]   Because of there were multiple proceedings below, there are multiple "records." For the Court's convenience, following is a listing of the abbreviations used to refer to the various records throughout this Brief:

"CR" represents the Clerk's Record from the state trial followed by the page number.

"RR" represents the Reporter's Record from the state trial record followed by volume:page number.

"CR Supp" represents the Supplemental Clerk's Record from the state trial followed by the page number.

"SHCR" represents the Clerk's Record from the state habeas proceeding followed by volume:page number.

"SHRR" represents the Reporter's Record for the hearing on the application for writ of habeas corpus followed by the volume:page number.

"Dkt" followed by a number represents the Docket number for a filing in the U.S. District Court in the federal habeas case.

31, 2007 [unpublished]).  Mr. Cobb did not seek certiorari review to the Supreme Court.

Mr. Cobb applied for a writ of habeas corpus in the state district court on May 11, 2006.  *Ex Parte Cobb*, No. 15,054-A.  Mr. Cobb alleged nineteen claims as well as fifteen sub-claims.  Among those claims was the single issue certified for appeal to this Court in the instant case.  Mr. Cobb's application was denied in the district court (*see* Record Excepts Tab 11) and, again, denied on appeal to the CCA.  *Ex Parte Cobb*, No. 68,192-01; 68,192-02 (Tex. Crim. App. Dec. 5, 2007) (Record Excepts Tab 12).

Mr. Cobb filed a petition for relief under 28 U.S.C. §2254(a) in U.S. District Court for the Eastern District of Texas.  (Dkt 12)  The district court denied the petition in a final order dated February 15, 2011.  (Dkt 20)  Mr. Cobb timely filed a Notice of Appeal on March 16, 2011.  (Dkt 25)  Mr. Cobb filed a Motion for a Certificate of Appealability in the District Court requiring permission to appeal multiple issues.  (Dkt 26)  The District Court granted Mr. Cobb's Motion for a Certificate of Appealability on the single point presented in this appeal.  (Dkt 27)

# STATEMENT OF FACTS

Richard Aaron Cobb was charged with a murder that occurred during the course of a robbery committed by Mr. Cobb and an accomplice, Beunka Adams. Most of the underlying facts were not in dispute at the trial and there was no question that Mr. Cobb participated in these terrible crimes. The defense strategy on guilt/innocence was focused on showing that the primary mover in the crimes was Adams and that Mr. Cobb behaved as he did during the crimes because of his fear of Adams. At sentencing, one of the crucial issues was whether Mr. Cobb was at risk of committing future violent offenses. Again, central to that question was whether Mr. Cobb acted of his own violition in participating in the murder or whether he acted only because of his fear of Adams.

One of the most – if not *the* most — important witnesses for the state on both of these issues was a jailhouse snitch named William Elmer Thomsen who was himself facing criminal charges. Mr. Cobb claims that the state withheld evidence that Thomsen believed he had a "deal" with the state through which Thomsen was to receive leniency in exchange for his testimony against Mr. Cobb. As a result, Mr. Cobb's attorneys were not able to effectively cross-examine Thomsen or to rebut his highly damaging testimony.

# I.    The Guilt/Innocence Phase

At the time of the offense in September 2002, Mr. Cobb was an eighteen-year-old man.  While at Rusk High School, he began to hang around Beunka Adams, a classmate who he initially met in the ninth grade.  (RR 90:34-35)  Adams proved to be a terrible influence on Mr. Cobb.  While both boys engaged in criminal behavior as juveniles, it was Adams who introduced the crime of aggravated robbery to Mr. Cobb.  (RR 90:36)  Adams told Mr. Cobb that armed robbery was the easiest money he could make.  (RR 90:37)

Mr. Cobb's adoptive parents (Paul and Elaine Cobb) had been experiencing severe financial difficulties.  (RR 90:40)  Paul was diagnosed with asbestos cancer and emphysema, causing him to quit his job.  (RR 90:38)  After that, the family could no longer afford their home and were forced to declare bankruptcy.  (RR 90:41)  Mr. Cobb tried to sell cocaine for money but quickly got into debt with a drug dealer.  (RR 90:41-42)  Adams suggested that Mr. Cobb join him in armed robbery.  (RR 90:42)

Adams and Mr. Cobb committed two armed robberies in August 2002.  (RR 90:45)  The first robbery was at the Roadrunner in Jacksonville, and the second was at the Conoco in Jacksonville.  (RR 90:44)  Adams supplied the gun, and Mr. Cobb used his mother's car.  (RR 90:42)  Adams stayed in the car while Mr. Cobb

ran inside the stores to commit the robberies.  (RR 90:44)  After these two robberies, Mr. Cobb suggested they sell the gun used in the robberies, but Adams rejected the idea, stating that the gun was needed for one more robbery.  (RR 90:46)

The following week, Mr. Cobb used cocaine often and drank alcohol and smoked marijuana daily while sleeping only four-five hours per night.  (RR 90:45) On September 2, 2002, Adams talked about robbing another store.  (RR 90:47) Adams told Mr. Cobb to get a mask because they were going to rob a store called BDJ's that night.  (RR 90:48)

BDJ's was within walking distance through a wooded area from Adams' house.  Adams decided that both he and Mr. Cobb would enter the store, Mr. Cobb would carry the gun and he would demand the money.  (RR 90:49)  After the robbery, Adams' plan was that the two men would walk back to Adams' house through the cover of the woods.  (RR 90:49)

When they arrived at BDJ's, Mr. Cobb recognized a car parked in the front as that of his preacher.  (RR 90:51)  Mr. Cobb told Adams that they should not rob a preacher.  (RR 90:51)  Adams walked towards the store to see who was inside. (RR 90:51)  He came back to Mr. Cobb and reported that there were only two girls in the store.  (RR 90:51)  Mr. Cobb told Adams that he did not want to go into the

store, but Adams was persistent. (RR 90:51) Adams put on the mask and a pair of gloves and Mr. Cobb used a bandana to cover his face and one glove and shirtsleeve to cover his hands. (RR 90:51)

At this point, Adams changed the plan. He told Mr. Cobb that, instead of getting away on foot, he would get the keys to the car parked out front and use that car as their getaway. (RR 90:53) They both walked into the store, where Adams spotted Kenneth Vandever and ordered him to stand beside the girls behind the counter. (RR 90:54) Adams took the money from the register. (RR 86:70) Adams demanded the keys to the car parked out front. (RR 90:54) Candace Driver said it was her car and went to retrieve the keys from her purse. (RR 90:54) Adams then once again changed the plan and told the three hostages that they were going for a ride with them. (RR 90:54)

When they approached the car, Adams took the gun from Mr. Cobb. (RR 90:56) Adams gave out seating assignments: Adams was to be the driver, Nickie Ansley Dement would sit in the front passenger seat, and the three others would all sit in the backseat. (RR 90:56) As soon as Adams got in the front seat, he passed the gun back to Mr. Cobb. (RR 90:56)

As he was driving, Adams took his mask off and began talking to Nickie. (RR 90:57-58) Nickie recognized Adams from school but, at that time, was

unsure of his name.  (RR 86:77)  Adams told Nickie that he was stealing money for his kids.  (RR 86:74)  Adams said that he and Mr. Cobb were driving to meet with friends, but Mr. Cobb had never heard of this part of the plan.  (RR 90:57) Adams drove through a few country roads eventually stopping at a remote place nicknamed the "pea patch."  (RR 90:59)

Once at the pea patch, Adams ordered the two women and Kenneth out of the car and into the trunk.  (RR 90:61-62)  Candace said that they could not all fit in the trunk.  (RR 90:63)  Adams threatened them with the gun, saying that if they did not get into the trunk, he was going to take them out to the pasture.  (RR 90:64)  Adams then dislodged a shell and Candace started to cry.  (RR 90:64) Candace and Kenneth climbed into the trunk.  (RR 90:64)

Adams, Mr. Cobb and Nickie started to walk towards the road.  (RR 90:64) Adams still had the gun.  (RR 90:65)  All three walked towards the road and then started to walk back towards the car, but Adams pulled Nickie over into the bushes.  (RR 90:65)  Mr. Cobb took the gun from Adams and walked towards the car leaving Adams and Nickie in the bushes.  (RR 90:65)  Adams told Nickie, "I want sex before we go."  (RR 86:81)  Adams removed Nickie's clothes and he sexually assaulted her.  (RR 86:85-86)  Adams then turned Nickie over onto her stomach.  (RR 86:86)  Nickie began struggling and saying "no."  (RR 86:86)

Adams told her, "Well, you can either do that or you can go down on me." (RR 86:86) Adams then grabbed Nickie's head and forced his penis into her mouth. (RR 86:86) After this, Adams pushed Nickie on the ground and vaginally penetrated her again. (RR 86:86) Adams then jumped up and said, "If you can't enjoy it then I can't enjoy it too much either." (RR 86:87) They put their clothes back on and then walked towards the car. (RR 86:87) Mr. Cobb was not present for the rape. (RR 86:87; 90:66)

Nickie and Adams returned to the car. (RR 90:72) By this time, Nickie recognized Mr. Cobb's face from school and knew she was friends with his older brother, but could not remember his name. (RR 86:84) Privately, Adams told Mr. Cobb that Mr. Cobb "should try to get some pussy." (RR 90:72) Mr. Cobb said "no." (RR 90:72)

Adams then released Candace and Kenneth from the trunk, but only for a few minutes. (RR 90:72) Shortly thereafter, Adams ordered Candace and Kenneth back into the trunk. (RR 86:87) Candace was crying and refused to get into the trunk again. (RR 86:87) Adams took the gun from Mr. Cobb, pointed it at her and cocked it. (RR 86:87) Nickie asked Candace to do as Adams ordered. (RR 86:88) Candace and Kenneth returned to the trunk. (RR 86:88) Adams and Nickie walked towards the road again, while Mr. Cobb sat in the passenger seat of

the car.  (RR 90:74)

Adams and Nickie returned to the car.  (RR 90:74)  Adams asked Mr. Cobb why he was not talking.  (RR 90:74)  Adams also asked Mr. Cobb what he wanted to do with the hostages.  (RR 90:74)  Mr. Cobb suggested taking the car and leaving the hostages in the pea patch.  (RR 90:74)  Adams thought for a minute and then said, "There has been a change of plans."  (RR 90:74)  Adams opened the trunk and released Candace and Kenneth.  (RR 90:74)  Adams instructed the hostages to walk away from the car because he and Mr. Cobb were going to leave. (RR 90:74)

However, Adams changed his mind again.  After the hostages began walking away, Adams told Mr. Cobb that they should be tied up.  (RR 90:75; 86:90)  Adams ordered the hostages to take their shirts off and he tore them up with his pocket knife.  (RR 90:75)  Adams tied up the hostages and instructed them not to move until they heard the car drive away.  (RR 90:75)  Kenneth said he needed to take his medicine.  (RR 86:95)

Adams changed his mind again.  Adams took the gun from Mr. Cobb and loaded the dislodged shell.  (RR 90:76)  Adams told Mr. Cobb that they were going to have to "off" the hostages.  (RR 90:76)  Mr. Cobb protested saying, "no, I can't do it."  (RR 90:76)  With that, Adams handed the gun back to Mr. Cobb.

(RR 90:78)  Mr. Cobb secretly turned the safety on and pretended that the gun was jammed.  (RR 90:78)  Adams took the gun, examined it, loaded it and then handed it back to Mr. Cobb.  (RR 90:78)  Again, Mr. Cobb secretly turned the safety on and told Adams that the gun did not work.  (RR 90:78)  Adams took the gun and fired it into the air.  (RR 90:78)  Adams told Mr. Cobb that if only one of them does the shooting then only one of them is leaving.  (RR 90:79)  Mr. Cobb took this as a viable threat because Adams had previously told him that he had shot a person.  (RR 90:79-80)  Adams handed the gun to Mr. Cobb.  (RR 90:81)  Mr. Cobb aimed the gun at Kenneth, closed his eyes and fired.  (RR 90:81)

Adams grabbed the gun from Mr. Cobb and fired the second shot.  (RR 90:82)  Both Nickie and Candace fell forward.  (RR 86:82)  Adams had shot Nickie in her shoulder.  (RR 86:97)  Adams first ran to Candace and yelled, "Are you bleeding?"  (RR 90:82)  Candace replied, "No, I'm not bleeding."  (RR 86:97)  Adams pointed the gun directly at Candace's face and fired.  (RR 90:82)  Adams then turned his attention towards Nickie.  Adams asked Mr. Cobb if he hit Nickie, and Mr. Cobb replied, "no."  (RR 90:82)  Adams kicked Nickie four to five times.  (RR 90:82)  Nickie believed that both Adams and Mr. Cobb kicked her, but she only saw Adams kicking.  (RR 86:99)  Mr. Cobb walked over to Nickie, held a lighter to her face and said, "She's dead."  (RR 90:82)

Adams and Mr. Cobb got in the car and drove away, leaving Nickie, Candace and Kenneth behind. (RR 90:83) Kenneth died, but both Nickie and Candace survived. (RR 86:102) With the benefit of the information provided by the survivors, both Adams and Mr. Cobb were located and arrested the following morning, of September 3, 2002. (RR 88:77-81, 88)

After Mr. Cobb testified in his own defense regarding how Adams had pressured Mr. Cobb into committing the murder, the state called William Elmer Thomsen, a former cell-mate of Mr. Cobb, to refute Mr. Cobb's defense of duress. (RR 91:48) Thomsen testified that while the two were in jail together Mr. Cobb told him of the other armed robberies Mr. Cobb and Adams had committed. (RR 91:48) Thomsen also testified that Mr. Cobb told him that he and Adams intended to rob a Whataburger before they got arrested. (RR 91:49) Most damaging, Thomsen testified that Mr. Cobb told him that, as a defense to the capital murder charge, he intended to falsely blame it on Adams and say that Adams had threatened him. (RR 91:50) Importantly, Thomsen claimed that he had not received any benefit from the prosecution in exchange for his testimony. (RR 91:52) Thomsen further testified that, at the time he contacted the District Attorney, his charge of being a felon in possession of a firearm had already been dismissed but that he was still in jail awaiting resolution of his parole violation

charge.  (RR 91:51)  Thomsen's parole was eventually revoked, and he remained incarcerated until May 2003.  (RR 91:51-52)

The jury rejected Mr. Cobb's defense of duress and convicted him of capital murder.

## II.    The Punishment Phase

### A.    The State's Case

The state's evidence at the punishment phase fell into five general categories: (1) victim impact testimony; (2) reputation evidence; (3) evidence of prior crimes committed by Mr. Cobb; (4) the testimony of William Thomsen; and (5) expert testimony related to Mr. Cobb's risk of future dangerousness.

Nickie Dement explained the physical pain she suffered while healing from her wounds.  (RR 93:8-17)  She also described the emotional toll this crime had on her, including sleeping disorders, flashbacks and depression.  (RR 93:24-26) Further, Nickie's surgeon and home health nurse explained her medical conditions.  (RR 93:28-47)

Ronnie Miller, Roy Cavazos, John Page, Jonathan Rhodes, and Darrell Atwood testified that Mr. Cobb had a bad reputation for peacefulness.  (RR 93:50; 93:52; 93:67; 93:111; 94:171)

In an effort to link Mr. Cobb to two other robberies – at Roadrunner store

on August 27, 2002 (which Mr. Cobb had admitted committing) and at an Exxon/Chevron on August 30, 2002 – the state presented several witnesses as well as a surveillance video from the robbery at the Roadrunner store. However, none of these witnesses or the video linked Mr. Cobb to the August 30 robbery at the Exxon/Chevron store. (RR 93:53-71)

Joe Strickland testified that his weekend home in Cherokee County was burglarized in 1999 by Mr. Cobb and his brothers. (RR 93:114) Strickland pulled a gun on the boys and made them lay on the ground until the sheriff arrived. (RR 93:116) Strickland testified that Mr. Cobb showed no fear and expressed no remorse. (RR 93:116, 117)

Beunka Adams' brother, Dakedrion Tucker, testified that, one day while he was in his bedroom, Mr. Cobb and Trent O'Neil came into his room. (RR 93:120) Mr. Cobb was carrying a knife, but O'Neil attacked Dakedrion. (RR 93:122)

Mr. Cobb's juvenile probation officer, Darrell Atwood, testified that Mr. Cobb did not want to participate in boot camp and did not comply with probation. (RR 94:170)

William Elmer Thomsen, the jailhouse witness, testified again. He explained that Mr. Cobb told him that he was mad that Nickie and Candace survived because otherwise he would probably not be in jail. (RR 94:124)

Thomsen claimed that Mr. Cobb told him that he got a rush out of shooting Kenneth. (RR 94:125) Thomsen further testified that Mr. Cobb told him that, if given the chance again, he would do the same thing. (RR 94:126) Finally, Thomsen stated that Mr. Cobb expressed a desire to escape. (RR 94:126) Although Mr. Cobb had been well behaved throughout the rest of the trial, during Thomsen's testimony, Mr. Cobb expressed surprise and outrage at this testimony by shouting, "you lying son-of-a-bitch. I never said no such thing." (RR 94:125)

Dr. Tynus McNeel, a psychiatrist, opined that there is better than a 50/50 chance that Mr. Cobb is likely to commit future acts of violence regardless of where he is. (RR 93:96) Dr. McNeel explained that the best indicator of future violence is past violence, and each episode of violence increases the potential future risk. (RR 93:97) Further, Dr. McNeel testified that another risk factor is the combination of personality disorder and substance abuse. (RR 93:97) Without ever examining Mr. Cobb, Dr. McNeel testified that Mr. Cobb probably has anti-social personality disorder. (RR 93:99)

A.P. Merillat is a criminal investigator with the Special Prosecution Unit in Huntsville. (RR 94:139) He told the jury that it is possible for an inmate to commit crimes of violence while housed in the Texas prison. (RR 94:146) Merillat also testified that there have been instances in which inmates convicted of

capital murder escaped from Texas prisons.  (RR 94:148)

**B.    The Defense's Case**

Richard Cobb was one of five children born to Amy Reeder.  Amy's children, in birth order, are: Nicholas, Michelle, Luke, Richard, and William.  (RR 95:34)  Amy drank alcohol excessively and used drugs during all of her pregnancies and while breast-feeding.  (RR 95:36)  Amy would often leave the children alone in the house for days at a time.  (RR 95:39)  Nicholas, the eldest child, was left alone with the rest of the children so many times he could not remember the first time.  (RR 95:44)  Nicholas remembers having to listen to his mother have sex with different men nearly every night.  (RR 95:45)

In 1986, CPS became involved with Amy and her children.  (RR 94:177)  CPS required that Amy take her children to Kinder Kare for daycare.  (RR 95:18)  When the children arrived at the Kinder Kare, they were neglected, hungry, bruised, and underweight.  (RR 95:19)  Mr. Cobb was less than three years old at the time.  (RR 95:19)  Amy would often come to collect the children drunk, and the day care worker, Kathryn Martin Ashley, would refuse to allow her to take the children.  (RR 95:20)  Once, when Amy failed to pick up the children at the day care, Ashley drove the children to Amy's house and found William, the youngest child, abandoned in the home.  (RR 95:22)  William was alone in a crib covered

with roaches.  (RR 95:22)

Eventually, Amy's rights as a parent of Michelle, Luke, Richard, and William were terminated.  Luke, Richard and William were adopted by Elaine and Paul Cobb when Richard was three years old.  (RR 95:2)  When the boys began living with the Cobbs, they were starved and would horde food.  (RR 94:179)  Before the adoption was complete, Amy had visitation rights.  After her visits, the children would lock the doors and ask if they could move to another house because they feared Amy.  (RR 94:180)  Elaine Cobb described a time when Amy was visiting and she saw Amy licking the boys in their bed.  (RR 94:182)  That was the last time Amy was permitted to visit.  (RR 94:182)

Mr. Cobb did not see Amy again until two years before his trial.  (RR 94:183)  As an adult, Nicholas, the eldest, was trying to reunite with his brothers.  (RR 94:183)  Nicholas asked Mr. Cobb if he wanted to visit Amy.  (RR 94:183)  Luke and Mr. Cobb reluctantly agreed.  They met Amy at her apartment in Dallas.  (RR 94:183)  Amy told Mr. Cobb that the man he thought was his father was not and, therefore, that none of his brothers were his full brothers.  (RR 94:184)  Mr. Cobb was sixteen at the time.  (RR 94:184)

When Mr. Cobb was in the seventh grade, he was sent to boot camp for disciplinary problems.  (RR 96:153)  He failed to complete the program the first

time but was successful the second time.  (RR 96:153)

In 1996, Paul Cobb was diagnosed with asbestosis cancer.  (RR 94:185)
Paul's lung collapsed and he lived the last seven years of his life with only
one-third of one lung.  (RR 94:184)  The same year Paul was diagnosed with
cancer, Elaine's mother and brother died.  (RR 94:185)  Elaine testified that this
affected Mr. Cobb deeply.  (RR 94:185)

Elaine testified that William was the child that gave her the most trouble.
(RR 95:6)  William reported hearing the voice of the devil and was diagnosed with
bi-polar disorder.  (RR 95:5, 16)  In fact, William's behavior was so bad that the
Cobbs had to send Mr. Cobb to live with his grandparents for a short while so that
the Cobbs could focus all their attention on William.  (RR 95:16)

In the summer of 2002, Elaine noticed that Mr. Cobb began to act moody.
(RR 94:186)  He stayed out late and spent a lot of time with Buenka Adams.  (RR
94:186)  During this time, Mr. Cobb was using cocaine heavily – some 100-200
times.  (RR 96:170)  The night before Mr. Cobb was arrested, he used crack for
the first time.  (RR 96:170)

By the time of Mr. Cobb's trial, his family life had altered tremendously.
Paul Cobb died of cancer while Mr. Cobb was in jail awaiting trial.  (RR 94:188)
Luke was diagnosed with paranoid schizophrenia and was hospitalized in the Rusk

State Hospital.  (RR 94:189-90)  Nicholas, the eldest and the one brother not adopted by the Cobbs, was paroled from prison a few months before the trial and was addicted to marijuana.  (RR 95:48-49)  William continued to suffer from bi-polar disorder.  (RR 95:16)

Mr. Cobb testified during sentencing and expressed remorse for the murder of Kenneth.  (RR 96:152)  He testified that he felt emptiness about killing Kenneth.  (RR 96:152)  Mr. Cobb also testified that Thomsen's testimony against him was fabricated.  He refuted Thomsen's statement that he said that he had gotten a rush out of killing Kenneth.  (RR 96:151)  Mr. Cobb testified that he never told Thomsen that he planned to rob the Whataburger.  (RR 96:157)  Mr. Cobb also denied telling Thomsen that he wanted to escape.  (RR 96:158)  Mr. Cobb testified that Thomsen had arrived at the jail after Mr. Cobb was incarcerated and the facts of his case were well publicized as a result of which, by the time Thomsen and Mr. Cobb met in jail, Thomsen was already knowledgeable of many of the facts of Mr. Cobb's crime.  (RR 96:160)  Mr. Cobb was upset and spent much of the time in jail crying.  (RR 96:159)  Thomsen would come into Mr. Cobb's cell in an apparent effort to console him.  (RR 96:159)

The defense also presented the expert testimony of Joan Mayfield, who is a neuropsychologist at Our Children's House at Baylor in Dallas.  (RR 95:63)  She

evaluated Mr. Cobb twice and conducted a series of tests. (RR 95:65) Dr. Mayfield noted that Mr. Cobb suffered from several cognitive weaknesses, including deficits in attention, language, intellectual functioning, processing speed, reading comprehension and writing. (RR 95:66-72) Mr. Cobb also suffered from hyperactivity and an inability to make proper eye contact. (RR 95:74) However, once Mr. Cobb was placed on anti-depressant medication, his eye contact and attention improved. (RR 95:75) Because of his deficits, Mr. Cobb would have trouble processing new information quickly. (RR 95:79) Dr. Mayfield opined that these deficits were consistent with fetal alcohol syndrome. (RR 95:78) As a consequence, Mr. Cobb displayed rather flat affect, meaning that he feels emotion but is unable to show it. (RR 95:80) Finally, Dr. Mayfield testified that, with medication, Mr. Cobb was more equipped to function in society. (RR 95:82)

The defense also presented the testimony of Seth Silverman, a psychiatrist who conducted a risk assessment of Mr. Cobb. (RR 96:114) Dr. Silverman explained that conducting a risk assessment entails determining, with medical probability, the risk that an individual with certain similar characteristics will be categorized as a re-offender. (RR 96:114) Dr. Silverman opined that, applying these characteristics to Mr. Cobb, there is a less than fifty percent chance that he

will re-offend.  (RR 96:114)  The special characteristics applicable to Mr. Cobb are his neurological damage, cognitive disorder caused by fetal alcohol and drug use, a history consistent with sexual abuse, prior criminal acts such as runaway, unauthorized use of an automobile, evading arrest, burglary of a coin machine, burglary of a habitation, burglary of a building, poor behavior in school, boot camp, and the fact that he committed three armed robberies and the murder in a few-week period.  (RR 96:118-19)  Dr. Silverman explained that, if Mr. Cobb's access to guns and drugs was limited and he was appropriately supervised, his risk of future violence would decrease significantly.  (RR 96:122)  Furthermore, if Mr. Cobb were to be released on parole in forty years, the chance of reoffending would be extremely low because, at that time, he would be 60 years old.  (RR 96:125)

After hearing the evidence, the jury sentenced Mr. Cobb to death.

### III.    The late production of the critical letters and motion for new trial

During the pretrial phase of the case, Mr. Cobb made timely requests that the state turn over impeaching evidence.[3]  However, the state failed to produce documents indicating that there was any "deal" with Thomsen or – even more relevant – indicating that Thomsen thought that he would receive any benefit in

---

[3]  *Brady* evidence and impeaching evidence were requested in multiple places in Mr. Cobb's pretrial motions.  *E.g.*, CR 19, CR 82 and CR 119 (Motion for Discovery and Inspection at Item 15).

exchange for his testimony  However, after the evidence was closed during the punishment phase the prosecutor provided a letter dated January 10, 2003 that he had written by the district attorney on behalf of Thomsen.  (RR 100:5)  This letter (DX-1 at the hearing for the motion for a new trial) informed Thomsen's parole officer that the district attorney would not prosecute Thomsen for the felon in possession of a firearm arrest.  The defense did not move to reopen the evidence to address this new evidence and the case proceeded to its ultimate verdict of death.

Mr. Cobb filed a motion for new trial in which, as one of his contentions, he alleged that the state had committed a Brady violation by withholding DX-1 from the defense.  (CR Supp 6)  During the last week of March, 2004, some three months after the trial was completed shortly before the April 1, 2004 hearing on the motion for new trial, the state provided to the defense a second letter (DX-2 at the hearing for the motion for a new trial), written by Thomsen to the district attorney and dated December 26, 2002.  (RR 100:5)  This astonishing letter, reproduced below,[4] detailed Thomsen's belief that he and the district attorney had

---

[4]  Both DX-1 and DX-2 should be contained in an Exhibits volume for the Motion for New Trial; however, counsel has been unable to locate that volume.  Both exhibits are, however, included elsewhere in the record as exhibits attached to Mr. Cobb's Motion to Recuse Judge, filed in the state habeas proceeding.  (SHCR 2: 27, 28)  DX-2 is also part of Cobb's Exhibit 5 from the state habeas evidentiary hearing and can be found in SHRR Volume 4.  For the Court's convenience, both DX-1 and DX-2 are included in the Appellant's Record Excerpts at Tabs 7 and 8 respectively.

a deal in exchange for his testimony and directly contradicted Thomsen's

testimony on that point at trial.

Mr. Beckworth-

Greetings Sir.  I hope your holidays were enjoyable.

I'm sorry to bother you.  Last check - Mon. 12-21-02 that Felony Possession of a Firearm by a Felon <u>and</u> the parole hold were still on the computer holding me in jail.  I have written my attorney Mr. Phiper 3 times this month reminding him he needs to process the paperwork for the dismissal that occurred in Nov. on this gun charge.  It was supposedly dismissed in Nov., however, I have never received this paperwork stating it.

*At our meeting in Mr. Hatch's office on 12-19-02 you agreed to completely clear this charge as well as try to have the parole hold lifted so I could get released.*  Mr. Hatch tried to phone my parole officer - Roy Shamblin - directly after our meeting, but was unable to locate him.  As you know the parole hold cannot be lifted until the gun charge is paperwork clear.

The only reason I bother you with this is because all efforts by myself and my girlfriend to contact Mr. Phiper by letter and phone have gone astray.  Could you please take steps to get Mr. Phiper in gear and have Mr. Hatch (remind him) to try contacting Roy Shamblin again.  I realize the holidays have caused a slow process.  I'm only asking for reminders for I'm sure everyone's mind is still in a holiday mode.  I would dearly love to at least spend New Years with my family.

Also - you asked a question at our meeting if Richard Cobb told me why they decided to take the girls and Kennith after robbing that store?  I now recall his answer was; "They wanted the keys to a car.  I believe Beonca [sic] had removed his mask at this time and spoke Rich's name so they told the girls to come with them"!  The girls said, "Please just take my car, here the keys, leave us here we won't tell anything"!  It's on my notes I gave Mr. Phiper.  I just forgot it.  You're welcome to those notes if you would like to bring them in as evidence.  Thank you for your time Sir.

Sincerely,
/s/ William Thomsen

(emphasis added).

At the hearing on the motion for new trial the attorney for Thomsen, Forrest Phifer, testified about his dealings with the state relevant to these two letters. Phifer stated that, at the request of his client, he contacted the district attorney in late 2002 or early 2003. (RR 100:7) The district attorney scheduled a meeting with Thomsen, his attorney, and the investigator for the district attorney. (RR 100:7) Phifer testified that at this meeting, held on December 19, 2002, there were no deals made between Thomsen and the DA's office. (RR 100:8) However, Phifer admitted that after he had been appointed to represent Thomsen he had requested an examining trial and that before the examining trial was scheduled he had requested the meeting with Randy Hatch, a representative of the DA's office. (RR 100:9) It was only after that conversation that Thomsen's new gun case had been dismissed at the examining trial stage. (*Id.*)

Elmer Beckworth, the district attorney and lead prosecutor, testified next. (RR 100:11) According to Beckworth, the gun case arose from an incident where Thomsen was arrested for riding around in a four-wheeler with a gun. (RR 100:13) He explained that it is his office's standard practice to dismiss a case set for an examining trial because the office does not have the resources to attend the examining trials. (RR 100:13) Later, if and after the office reviews the police reports and decides to accept the case for prosecution, he will seek indictment

during the next grand jury meeting.  (RR 100:13)  Thus, Beckwith made clear that even though the gun case against Thomsen had been dismissed at the examining trial stage, it could still have been pursued by the district attorney.

Beckworth testified that he had called Thomsen's parole officer and asked for leniency, but that this information was provided to the defense prior to trial.  (RR 100:14)  On the morning of punishment final arguments, after the evidence was closed, he became aware that the defense did not have the letter he wrote on Thomsen's behalf and gave it to Mr. Cobb's counsel, William House.  (RR 100:14)

Beckworth further explained that DX-1 (the letter Beckworth wrote on behalf of Thomsen) was found in the bottom of a drawer and that DX-2 (the letter Thomsen wrote to Beckworth) was misfiled in Beunka Adams' file labeled "work product."  (RR 100:17)  Beckworth explained that he found DX-2 in Adams' file while preparing for Adams' trial.  (RR 100:15)

Beckworth testified that the defense never took the opportunity to review the state's entire file through the open file policy.  (RR 100:19)  Beckworth stated that, had the defense done so, he would have verified that only actual work product items were in the work product file.  (RR 100:19)

The court denied the motion for new trial.  (RR 100:24)

**IV.**   **The Hearing on the State Application for Habeas Relief**

Following the denial of his direct appeal Mr. Cobb filed an application for habeas relief in state court.  The state habeas court granted Mr. Cobb an evidentiary hearing.

William House, Mr. Cobb's trial attorney, testified as to his experience with the undisclosed letters.  After Mr. Cobb was sentenced to death, District Attorney Beckworth gave him the letter Thomsen had written to Beckworth.  (SHRR 2:17) House explained that, although Beckworth labeled this letter as work product, he could think of no justification for doing so.  (SHRR 2:19)  House considered Thomsen's testimony to have been incriminating and material.  (SHRR 2:20) House testified that, had he had both of the letters, he would have cross-examined Thomsen differently.  (SHRR 2:21)  House opined that Thomsen left the false impression with the jury that there was no deal between him and the District Attorney because the letters imply that, at the very least, Thomsen thought there was a deal.  (SHRR 2:34, 28)

Elmer Beckworth again testified that the letter written by Thomsen was mistakenly placed in Adams' file.  (SHRR 2:93)  Beckworth said he discovered the letter while preparing for Adams' trial.  (SHRR 2:93)  Beckworth acknowledged that Thomsen knew that he would be interested in information

about Mr. Cobb.  (SHRR 2:97)  Significantly, Beckworth admitted that, at the time

that Thomsen wrote the letter, Thomsen obviously thought there was a deal.

(SHRR 2:100)  But Beckworth explained that, by the time of the trial, Thomsen

should have known there was no deal because his parole was revoked and he was

sent to prison after talking with the district attorney.  (SHRR 2:100)

Beckworth testified that he did not refer Thomsen's gun case to the US

Attorney because he believed the case did not fit the criteria of gun cases the US

Attorney was looking for.  (SHRR 2:101)  Also, Beckworth testified that, had he

taken Thomsen's case to trial, he believed Thomsen would have had a 75-80%

chance of an acquittal.  (SHRR 2:101)

James W. Volberding, a lawyer who represents five men on death row, also

testified.  (SHRR 3:6) Volberding stated that, without Thomsen's letters, an

effective cross-examination of Thomsen was impossible.  (SHRR 3:15)

The state habeas court adopted the proposed findings of fact and

conclusions of law submitted by the state recommending denial of Mr. Cobb's

application.  (SHRR 2:125)  The court found that no *Brady* violation occurred as

to the second letter because the defense counsel could have found it if he had

looked in the district attorney's files.  (SHRR 2:107-08, Conclusion of Law 3)

The state court further found that the two letters were not material to the issue of

punishment because there was no reasonable probability that the outcome of Mr. Cobb's trial would have been different had defense counsel known about the letters in time to use them at trial. (*Id.*, Conclusion of Law 5) The CCA agreed with the state trial court's recommendation, denying Mr. Cobb any relief. *Cobb*, No. 68,192-01; 68,192-02 (Record Excerpts Tab 12)

## V.     The Federal Habeas petition

Mr. Cobb next filed a federal petition for habeas corpus (Dkt 12) in which he raised multiple issues, including his *Brady* claim based on the Thomsen letters. Considering the *Brady* claim, the federal district court first concluded that the December 26, 2002 letter written by Thomsen and later found after trial in the co-defendant's file should have been provided to Mr. Cobb. (Dkt 21 at 16) Accordingly, the district court agreed with Mr. Cobb that the state habeas court's conclusion that the state had not erred by producing the letter was "unreasonable." (*Id.*)

However, the district court also concluded that the letter was not "material" in a *Brady* sense in that, in the court's view, had the evidence been available at use during the cross-examination of Thomsen there was no "reasonable probability" that the outcome of the case would have been different. (*Id.* at 19) Accordingly, the district court denied Mr. Cobb's *Brady* claim.

# SUMMARY OF THE ARGUMENT

The state withheld impeaching evidence that was vital to Mr. Cobb's defense. William Elmer Thomsen, a jailhouse snitch, was the most damaging witness to Mr. Cobb in regard to whether Mr. Cobb should receive the death penalty and it was vital that the defense be able to effectively cross examine him.

Thomsen had testified that he received no benefit in exchange for his testimony. However, after the close of the punishment evidence the state turned over a letter dated January 10, 2003 and written by the district attorney on behalf of Thomsen. Then, after Mr. Cobb was sentenced to death and the trial concluded, the state turned over an even more significant letter dated December 26, 2002 and written by Thomsen to the district attorney describing what Thomsen believed to be the deal between him and the state. In his federal habeas petition Mr. Cobb argued that those two letters – and most especially the December 26, 2002 letter written by Thomsen – were material to his defense because they would have enabled Mr Cobb's counsel to more effectively impeach Thomsen. Mr. Cobb asserts that because of the state's failure to disclose the two letters he was denied his constitutional right to a fair trial.

## ARGUMENT AND AUTHORITIES

### I.   Standard of Review

#### A.   Review of the federal district court's decision is *de novo*

Whether documents must be produced and whether they are material under

*Brady v. Maryland* is a mixed question of law and fact as to which a district

court's conclusions are reviewed *de novo* on appeal.  *Banks v. Thayer*, 583 F.3d

295, 309 (5th Cir. 2009); *Bower v. Quarterman*, 497 F.3d 459, 466 (5th Cir.

2007).  *See also United States v. Edwards*, 442 F.3d 258, 264 (5th Cir. 2006);

*Guidry v. Dretke*, 397 F.3d 306, 327 (5th Cir. 2005).

#### B.   Additional review requirements imposed by AEDPA

Mr. Cobb's *Brady* claim was presented in the state proceedings and

therefore is not subject to procedural default.  However, the claim is subject to the

additional review requirements of the Anti-terrorism and Effective Death Penalty

Act ("AEDPA"), 28 U.S.C. §2254(d), which provide:

> (d) An application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted with
> respect to any claim that was adjudicated on the merits in State court
> proceedings unless the adjudication of the claim -
>
> (1)    resulted in a decision that was contrary to, or involved an
>        unreasonable application of clearly established Federal law, as
>        determined by the Supreme Court of the United States; or
> (2)    resulted in a decision that was based on an unreasonable
>        determination of the facts in light of the evidence presented in

the State court proceeding.

Under Section 2254, for questions of law, a state court decision will be "contrary to" the Supreme Court's clearly established precedent if the state court either applies a rule that contradicts the governing law set forth in the Supreme Court's cases, or confronts a set of facts that are materially indistinguishable from a decision of the Court and nevertheless arrives at a different result from Supreme Court precedent. For mixed questions of law and fact, a state court decision will be an "unreasonable application of" the Supreme Court's clearly established precedent if it correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case. In distinguishing an "unreasonable application" from an "incorrect" one, the Supreme Court has clarified that "even if the federal habeas court concludes that the state court decision applied clearly established federal law incorrectly, relief is appropriate only if that application is also objectively unreasonable. *Penry v. Johnson*, 532 U.S. 782, 792-93 (2001). *See also Murphy v. Johnson*, 205 F.3d 809, 813 (5th Cir. 2000).

C.     **To apply the Standard of Review established under AEDPA would be unconstitutional**.

While Mr. Cobb believes that he is entitled to relief even under the stringent

requirements of AEDPA, he first maintains that §2254(d) violates the separation of powers and this Court should instead review the decisions of state courts for simple constitutional error without the further requirement that he also prove the state court's actions (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

### 1.    Doctrine of Separation of Powers

"The doctrine of separation of powers…is at the heart of our Constitution." *Buckley v. Valeo*, 424 U.S. 1, 119 (1976). To maintain the "vital check against tyranny," the power of the government is divided into three branches. *Id.* at 121. As taught in high schools across the country, Congress makes the law, the Executive enforces the law, and the federal court says what the law is. The Framers were particularly concerned with the legislative branch encroaching on the territory of the judiciary. "This sense of a sharp necessity to separate the legislative from the judicial power, prompted by the crescendo of legislative interference with private judgments of the courts, triumphed among the Framers of the new Federal Constitution." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 221

(1995).  Therefore, it was necessary for the judiciary, through the Supreme Court, to establish its own footing as a co-equal department of the government.  In the key case determining the scope of judicial review, the Supreme Court explained, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).  More importantly, the federal courts act as the protector of the Constitution and may not give effect to a law conflicting with the Constitution.  *Id.* at 177.

Congress may not interfere with the court's duty to interpret the law.  In *United States v. Klein*, 80 U.S. (13 Wall.) 128 (1872), the Court addressed a dispute arising from the aftermath of the Civil War.  During the war, Congress had authorized the government to seize and hold in trust abandoned property found in the Confederate states.  After the war, individuals were allowed to reclaim their property on proof in the newly-established Article III Court of Claims that they owned the property and had not aided the rebellion.  In interpreting this law the Court held that owners of abandoned property who had aided the rebellion, but who later were pardoned by the President after signing oaths of allegiance, could also recover their property.  *United States v. Padelford*, 76 U.S. (9 Wall.) 531 (1870).

Subsequently, Congress passed the Act of 1870, designed to reverse

*Padelford*. The Court refused to enforce this Act because "its great and controlling purpose is to deny to pardons granted by the President the effect which this court [in *Padleford*] had adjudged them to have ... as equivalent to proof of loyalty." *Klein*, 80 U.S. at 145. The Court further held, "We must think that Congress has inadvertently passed the limit which separates the legislative from the judicial power…. It is of vital importance that these powers be kept distinct." *Klein*, 80 U.S. at 147.[5] Thus, like *Marbury*, *Klein* forbade Congress from authorizing the Court's jurisdiction only to then limit the manner in which the Court may exercise its jurisdiction.[6]

## 2. Section 2254(d) Violates Separation of Powers

Section 2254(d) violates the doctrine of separation of powers in two regards. First, contrary to the holdings in *Marbury* and *Klein*, Congress afforded the federal courts habeas jurisdiction, but limited the courts' manner of review by

---

[5] *See*, Henry M. Hart, Jr., The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 Harvard L. Rev. 1362, 1373 (1953) ["If Congress directs an Article III court to decide a case, I can easily read into Article III a limitation on the power of Congress to tell the court how to decide it... [a point made] clear long ago in *United States v. Klein*."]; Christopher Eisgruber & Lawrence Sager, Why the Religious Freedom Restoration Act is Unconstitutional, 69 N.Y.U. L. Rev. 437, 471 (1994) ["*Klein* prohibits . . . the conscription of the Court to play a role in a charade . . . in which the Court is obliged to act as though its own judgment in a matter of consequence is different than it actually is."].

[6] *See also*, *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 430 (1995); *Yakus v. United States*, 321 U.S. 414, 468 (1944) (Rutledge, J., dissenting); James S. Liebman & William F. Ryan, "Some Effectual Power": The Quantity and Quality of Decisionmaking Required of Article III Courts, 98 Columbia L. Rev. 696 (1998).

suspending stare decisis.  Second, §2254(d) prohibits the federal courts from

saying what the law is.  Instead, §2254(d) requires the federal courts to defer to

and uphold state court decisions erroneously interpreting federal constitutional

law.

The Supreme Court has never directly determined the constitutionality of

§2254(d).  In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court denied

certiorari on that very question.  However, Justice Stevens, joined by Justices

Souter, Ginsberg and Breyer, advocated for an interpretation of §2254(d) in which

the "mood" made "clear that Congress intended federal judges to attend with the

utmost care to state-court decisions, including all of the reasons supporting their

decisions, before concluding that those proceedings were infected by

constitutional error sufficiently serious to warrant the issuance of the writ."  *Id.* at

386 (Stevens, J., concurring).  Despite the mood of utmost care, the four-justice

plurality maintained it was the federal courts' duty to say what the law is.  *Id.* at

387 (Stevens, J., concurring).

Additionally, dissenting from the Ninth Circuit's denial for rehearing en

banc, Judges Pregerson, Gould, Paez and Berzon joined Judge Reinhardt's opinion

in *Crater v. Galaza*, 508 F.3d 1261 (9th Cir. 2007).  Judge Reinhardt explains:

I would hold that section 104 of the Antiterrorism and Effective Death

Penalty Act ("AEDPA"), violates the separation of powers doctrine and is unconstitutional….It does so in two principal ways:  first, by prohibiting the federal courts from applying the ordinary principles of stare decsis in deciding habeas cases involving prisoners held in state custody, thereby interfering with the federal courts' normal adjudicatory process; and second, by requiring federal courts to give effect to incorrect state rulings that, in the federal courts' independent judgment, violate the Constitution.

*Id.* at 1261-62 (Reinhardt, J., dissenting).  *See also*, *Evans v. Thompson*, 524 F.3d 1 (1st Cir. 2008).

### 3.    Section 2254(d) violates Separation of Powers because Congress ordered the suspension of the judicial tool of stare decisis.

As explained in *Marbury* and *Klein*, once Congress grants jurisdiction to the federal courts to resolve matters it may not dictate how the federal courts must adjudicate those matters.  However, this is precisely what §2254(d) does.

Pursuant to §2254, a petition for a writ of habeas corpus may only be granted if the state court's decision was objectively unreasonable in light of clearly established federal law as determined by the Supreme Court.  Thus, an objectively unreasonable decision in light of clearly established federal law as determined by the circuit courts is not enough to warrant granting relief.  Therefore, when determining the merits of habeas claim, the federal courts are deprived of an essential tool - stare decisis - whereas in all cases but those governed by §2254(d), the law of the land in that circuit would control.  Along

those same lines, the law as interpreted in other circuits would also be instructive. However, in the habeas context as prescribed by §2254(d), federal courts are required to suspend the judicial tool of stare decisis and instead defer to the state court finding.

> **4.      Additionally, §2254(d) violates Separation of Powers because Congress requires federal habeas courts to defer to and uphold state court decisions erroneously interpreting federal constitutional law.**

The limitations imposed by §2254(d) have been interpreted and applied to require federal habeas courts to defer to state court constitutional decisions. *Lindh v. Murphy*, 521 U.S. 320, 333 n. 7 (1997) (discussing "§2254(d)'s new, highly deferential standard for evaluating state court rulings"); *Middleton v. McNeil*, 541 U.S. 433, 437 (2004) (per curiam) (grant of habeas relief reversed because the lower court's ruling "failed to give appropriate deference to the state court's decision."). The Supreme Court explained this "highly deferential standard for evaluating state-court rulings" was formulated to effectuate Congress's 1996 redesign of the habeas corpus regime to vest in the state courts "primary responsibility" for enforcing federal constitutional standards in state criminal proceedings. *Woodford v. Visciotti*, 537 U.S. 19, 24, 27 (2002) (per curiam); *Middleton*, 541 U.S. 433; *Lindh*, 521 at n. 7. Thus, it is no longer sufficient for a

habeas petitioner to demonstrate that a lower state court committed error – or even

clear error – in the application of constitutional law to his habeas claims.

> It is not enough that a federal habeas court, in its "independent review of the legal question," is left with a "'firm conviction'" that the state court was "'erroneous.' " [Citation omitted]  We have held precisely the opposite: "Under §2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." [Citation omitted]  Rather, that application must be objectively unreasonable.

*Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003).

The Supreme Court's prescribed mode of §2254(d) analysis confirms that

this statute uniquely restricts the Article III powers of federal courts in habeas

cases.  In both *Williams v. Taylor, supra* and *Wiggins v. Smith*, 539 U.S. 510

(2003), the Court applied §2254(d) by first determining whether the federal

constitutional claim (ineffective assistance of counsel in each case) had merit; and

then evaluated the state court decision, observing the constraints of §2254(d)(1).

That is, after the Article III court has concluded that the petitioner is in custody in

violation of the federal constitution, it must further determine that the standards of

§2254(d)(1) have been met before it can remedy that violation.

In a close case, §2254(d)(1) will result in denial of habeas relief where the

existence of constitutional error is undisputed.  Thus, the statute creates a class of

cases in which a state court's decision is found to be in violation of the supreme law of the land as determined by the Supreme Court but is given controlling effect over the judgment of any Article III court. In these cases, the Article III court is commanded to evaluate the petitioner's constitutional claims but is prohibited from remedying any violation.

### 5. Conclusion

This Court should hold that §2254(d) is unconstitutional and review the decision of the state courts for simple constitutional error rather than under the more stringent standards required by AEDPA.

## II. Discussion of Mr. Cobb's Single Point of Error

### A. The importance of the withheld evidence

The single most damning piece of evidence presented by the State on the issue of punishment was the testimony of a William Elmer Thomsen. Taken as a whole, Mr. Thomsen's testimony tended to paint Mr. Cobb as almost a sociopathic individual who had a lack of remorse about his crime, who lacked empathy with others, who intended to commit other violent crimes in the future, and who lied at trial about the crime for which he was on trial, falsely blaming his co-defendant for his own actions.

No other witness for the state provided such direct and damning evidence of

Mr. Cobb's alleged character and propensity for committing future acts of violence. It was, therefore, critical that the defense have in its possession any and all evidence that might be used to impeach him. More specifically, it was vital that the defense have access to any evidence indicating that Thomsen thought there was a prospect of receiving leniency in exchange for testimony favorable to the state.

Importantly, during his cross examination during the guilt-innocence phase of the trial Thomsen denied that he had any expectation of a "deal" with the prosecution by which he would receive leniency in his case in exchange for his testimony.

> Q:   Were there conversations with and did you not, in fact, receive
>      benefit as a result of your cooperation?
> A:   No sir, I didn't. There was no deal whatsoever.

(RR 91:52) Even worse, Thomsen affirmatively misled the jury during the punishment phase when he told the jury that his motivation for testifying was because Mr. Cobb never expressed any remorse while they were in jail together.

> Q:   Did he ever express any remorse about what happened?
>
> A:   No sir. *That's why I am here today*.

Emphasis added. (RR 94:125)

If the jury believed Thomsen's denial of expecting a specific *quid pro quo*

in exchange for his testimony against Mr. Cobb and instead believed that he was motivated solely because of his distaste for Mr. Cobb's alleged lack of remorse it would certainly have been much more likely to credit his testimony.

The December 26, 2002 letter from Thomsen to the lead prosecutor directly and unmistakably indicates that Thomsen's testimony about his motives was a lie. In the letter, Thomsen states clearly, "At our meeting in Mr. Hatch's office on 12-19-02 you agreed to completely clear this charge as well as try to have the parole hold lifted as I could get released." It was only as a result of this expectation of a "deal" that Thomsen cooperated with the state.

While the state can now argue that eventually Thomsen's probation was indeed revoked and he went to prison anyway, by the time those events unfolded it was too late for Thomsen to change his story as he had already been debriefed by the DA and was locked into his testimony. Indeed, he could potentially have been prosecuted for obstruction of justice had he deviated from the story he had already told to the prosecutors.[7]

The key to discrediting Thomsen in the jury's eyes was to show that, in the December 2002 time frame, when he was first telling his story to the prosecutors,

---

[7] The statute of limitations for the gun charge would not expire until October 21, 2005. TEX. CODE CRIM. PROC. art. 12.01(6); (RR 91:51). Furthermore, at the time of trial, Thomsen still had one-and-a-half years left before completion of his parole. (RR 91:53)

he had a clear expectation *at that time* of a *quid pro quo* in exchange for his testimony. The withheld letters – and most particularly the December 26 letter – would have been invaluable to the defense in showing that fact to the jury.

## B. Legal standard applicable to *Brady* Claims

It is well established that the state's failure to disclose exculpatory and impeaching evidence, whether intentional or inadvertent, is a violation of the Due Process Clause of the Fourteenth Amendment. *Brady v. Maryland*, 373 U.S. 83, 86 (1963); *United States v. Bagley*, 473 U.S. 667, 676 (1985). To prevail on a *Brady* claim a defendant must show: "(1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; (3) and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 282 (1999). Suppression of material, favorable evidence results in constitutional error if there is a reasonable probability that, had the evidence been disclosed to the defense, the results of the proceeding would have been different. *Kyles v. Whitley*, 514 U.S. 419 (1995); *Bagley*, 473 U.S. at 682. However, the Supreme Court has made clear that, under the prejudice requirement, the question is "not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial,

understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434.

### C. The evidence was suppressed

The state courts rejected Mr. Cobb's *Brady* claim in part because of the state's assertion that because the two letters were in the district attorney's office and because the district attorney had an "open file" discovery policy, the defense counsel had an obligation to go look for them. (SHCR 2:88-89, Conclusions of Fact 17-24)

The federal district court disagreed with the state courts and found that this conclusion was unreasonable. The district court observed that the key December 26, 2002 letter was not in the prosecutor's files on Mr. Cobb, but only in the files relating to the co-defendant, Adams. As the court noted in its Memorandum Opinion, while a defense counsel may have a duty to go look in his own client's file at the prosecutor's office there is no obligation to search through the prosecutor's files relating to co-defendants. (Dkt 21 at 16)

When the state maintains an open file discovery policy – as the state asserted that it did in this case (RR 100:19, 2:8, 9, 12-13) – it is implicitly asserting that all the exculpatory materials are contained in the file given to the defense. *See, Strickler*, 527 U.S. at 284 ("If it was reasonable for trial counsel to

rely on, not just the presumption that the prosecutor would fully perform his duty
to disclose all exculpatory materials, but also the implicit representation that such
materials would be included in the open files tendered to defense counsel for their
examination, we think such reliance by counsel appointed to represent petitioner
in state habeas proceedings was equally reasonable.").  Accordingly, Mr. Cobb's
defense counsel cannot be faulted for having not discovered either letter before
trial.

      **D.**     **The evidence was material to the defense**

     In *United States v. Bagley*, 473 U.S. 667 (1985), at the time the
government's witnesses provided evidence to the government they believed they
were going to receive a monetary benefit.  *Id.* at 670-71.  The Court held that
evidence the witnesses *believed* they were going to receive payment from the
government – wholly aside from whether there ultimately was any such agreement
– was material impeachment evidence that should have been turned over to the
defense in compliance with *Brady*.  *Id.* at 683.  The Court remanded to the court of
appeals which determined that the government's failure to disclose deprived the
defendant of his constitutional right to a fair trial.  *Bagley v. Lumpkin*, 798 F.2d
1297 (9th Cir. 1986).

     This case is markedly similar to the situation presented in *Bagley*.  Here, at

the time Thomsen provided evidence to the state, through his debriefing, he

thought there was a deal.  This is evident from statement that Thomsen wrote in

his letter to the district attorney after the meeting.

> At our meeting in Mr. Hatch's office on 12-19-02 you agreed to completely clear this charge as well as try to have the parole hold lifted as I could get released.

It matters not whether there actually was any such agreement.  Thomsen *thought*

that there was and his cooperation was – in Thomsen's mind – expressly

conditioned on getting his charges taken care of.

> To sweeten the deal he thought he had made, Thomsen then offered up in

his December 26, 2002 letter new tales about Mr. Cobb that he had not previously

provided to the state.

> Also - you asked a question at our meeting on if Richard Cobb told me why they decided to take the girls and Kenneth after robbing that store? I now recall his answer was; "They wanted the keys to a car.  I believe Banco had removed his mask at this time and spoke Rich's name so they told the girls to come with them."  The girls said, "Please just take my car, here the keys, leave us here we won't tell anything."  It's on my notes that I gave Mr. Phiper.  I just forgot it.  You're welcome to those notes if you would like to bring them in as evidence.[8]

With this addition, the letter becomes irrefutable evidence that Thomsen would

say whatever he thought the state wanted him to say in exchange for the state

---

[8]  These notes, if they ever existed, apparently have never been produced to any of Mr. Cobb*'s* attorneys.

"taking care of" his criminal troubles. The letter begins by Thomsen's clear assertion that "we have a deal" and then follows with his complaint about how the deal hasn't yet been fulfilled by the state. He then reminds the state of how helpful he can be by offering up the new tidbit on Mr. Cobb quoted above.

The important time point for evaluating Thomsen's truthfulness was not when he actually testified, but rather when he first told his story to the prosecutors. One he had told his story to the district attorney's office Thomsen was locked in. Even if the state later backslid on what Thomsen thought the state had promised, by the time Thomsen wrote his December 26, 2002 letter it was too late for him to change his story as to do so would have ensured he received no leniency from the district attorney. Worse, Thomsen might have found himself with additional legal problems related to having made false statements to the prosecution.

### 1. The letters were material on the issue of future dangerousness

Thomsen's testimony during the punishment phase was extremely damaging on the future dangerousness issue. He contradicted Mr. Cobb's testimony that Mr. Cobb felt extreme remorse over the killing of Kenneth. (RR 94:125) Thomsen told the jury that Mr. Cobb would have committed the crime again. (RR 94:126) Thomsen also told the jury that Mr. Cobb wanted to escape. (RR 94:126) In

short, Thomsen painted Mr. Cobb as a monster killer who would gladly kill again if given the chance. Thomsen created fear in the jury – fear that, if the jury gave Mr. Cobb life imprisonment, it did so at its own peril. The impact of Thomsen's testimony was highlighted during the punishment closing arguments of the state.[9]

Mr. Cobb's counsel, William House, testified that he needed the letters for an effective cross-examination of Thomsen. (SHRR 2:21, 28) Thomsen was a key witness for the state regarding punishment and yet the defense did not cross-examine him. This is likely because any cross-examination during punishment would have mirrored the ineffective examination conducted in the guilt phase. Without the letters, the defense was not given adequate tools to defend. With both of the letters, the defense could have painted a much different picture of Thomsen. Instead of a man moved by his own conscience, the letters show Thomsen to be a jailhouse snitch looking out for his own self-interests. The

---

[9] During the punishment phase, the prosecutor told the jury:
Then while in jail told William Thomsen that he was going to say that Adams had threatened him, that was why he did; it wasn't true. Bragged about what happened, bragged about the prior robberies, showed no remorse, told Thomsen that he didn't know anyone was still alive until he was in jail, that he wished they had died. Talked about how he felt when Kenneth was killed. That he and Adams had planned another robbery at the Whataburger in Jacksonville had they not been caught. No problem with killing again and a desire to escape.
(RR 97:26-27). Later, the prosecutor emphasized Thomsen's testimony again, "Brags about his prior robberies, his intent to commit other robberies, no remorse, would do it again and if he has his chance he would escape." (RR 97:56)

latter reflects a witness willing to lie.

In rejecting Mr. Cobb's argument that Thomsen was critical in regard to the jury's determination of future dangerousness, the district court cited exclusively the testimony of the state's expert psychologist, Dr. McNeel as an alternative basis for the jury's finding of future dangerousness. (Dkt 21 at 17) However, Dr. McNeel's testimony was directly refuted by a psychiatrist called by the defense, Dr. Seth Silverman, who testified that, in his opinion, there is less than a fifty percent chance that Mr. Cobb would commit violence acts in the future. (RR 93:96 and 96:114) The testimony of the experts was, accordingly, at best a draw and could not reasonably have been the reason the jury chose death for Mr. Cobb. Thomsen's testimony was the tipping point.

### 2. The letters were material to the jury's assessment of Mr. Cobb's mitigation evidence

The defense presented a compelling mitigation case. Mr. Cobb was born, as were his brothers, addicted to alcohol and drugs because of his birth mother's constant use during all her pregnancies and breast-feedings. (RR 95:36) Mr. Cobb was neglected, starved and kept dirty as a young child. (RR 95:19) At the age of three, Mr. Cobb, along with two of his brothers, were adopted into a loving home. (RR 95:2) But the new life was not perfect. Mr. Cobb's father was

diagnosed with asbestos cancer and the family suffered financial difficulties ultimately resulting in them losing their home.  (RR 94:185; 90:38, 41)  Suffering from the permanent effects of fetal alcohol and drug ingestion, the boys were difficult children.  (RR 95:6)  Elaine Cobb explained that William was the most troublesome to the point that she had to send Mr. Cobb to live someone else so she could give William her full attention.  (RR 95:16)  At age 16, Mr. Cobb met his older brother and birth mother.  (RR 94:183)  His birth mother took one look at him and told him the man he thought was his father was not; meaning his brothers were not his full-brothers.  (RR 94:184)  Dr. Mayfield explained that Mr. Cobb suffered cognitive deficits most likely caused by fetal alcohol syndrome.  (RR 95:66-77)

Through the mitigation evidence, the defense was able to put the robbery/murder in context.  Mr. Cobb's family continued to experience financial problems.  (RR 90:40)  In the summer of 2002, Mr. Cobb began selling cocaine, but quickly got into debt with a drug dealer.  (RR 90:41-42)  He also used cocaine 100-200 times throughout the summer.  (RR 96:170)  Around this same time, Mr. Cobb began spending a lot of time with Buenka Adams.  (RR 90:34-35)  Adams told Mr. Cobb that armed robbery was the easiest money he'd ever make.  (RR 90:37)  In late August, Adams and Mr. Cobb committed two robberies of

convenience stores in Jacksonville. (RR 90:45) Mr. Cobb was prepared to quit the robbery business, but Adams convinced him to do one more – at BDJ's. (RR 90:46) In the previous robberies, the men had used a shotgun, but no one was hurt. (RR 90:48) That was the plan for the BDJ robbery as well. (RR 90:48) Tragically, Adams changed the plan. In fact, he changed the plan six times culminating in Mr. Cobb shooting and killing Kenneth. On the witness stand, Mr. Cobb expressed remorse for his crime and said killing Kenneth had left him empty inside. (RR 96:152)

To counter Mr. Cobb's mitigation evidence the state presented, broadly speaking, five categories of evidence: the state's expert witness, victim impact testimony, reputation evidence, evidence of prior crimes committed by Mr. Cobb and Thomsen's testimony. As noted above, the expert witnesses cancelled each other out and the other evidence – other than Thomsen's testimony – was hardly sufficient to outweigh the hefty mitigation case presented by the defense.

The state relied strongly on Thomsen's testimony to refute the mitigation case. The withholding of evidence that would have clearly exposed Thomsen for what he was – a jailhouse snitch making up tales to get out of jail free – cannot help but cause doubt about the fairness of the trial or undermine confidence in the verdict.

**3. The legal standard used by the district court to conduct its analysis of the impact of Thomsen's testimony on the mitigation issue was legally flawed**

The district court appears to have held Mr. Cobb to an impossible legal standard in meeting his burden of showing that the withheld evidence might have influenced the jury's decision on the mitigation question. On page 18 of its Opinion (Dkt 21) the district court states, "Because the jury has unbridled discretion as to how to decide whether to impose a life sentence, there is no way to determine whether there is a reasonable probability that, without crediting Thomsen's testimony, the jury would have determined that a life sentence, rather than death, was appropriate." This statement by the district court is curious as it indicates – if taken at face value – that a death penalty defendant can *never* establish that withheld evidence deprived him or her of a fair trial.

There are two points to make here. First, the court's statement simply cannot be right. Where a death penalty defendant asserts that he or she was deprived of a fair trial because of a *Brady* violation a reviewing court simply must engage in some sort of comparative assessment of the evidence. In this case, Mr. Cobb provided the jury with compelling evidence in mitigation. The question the district court was duty bound to answer was whether, had the jury chosen to discredit Mr. Thomsen's testimony, the jury might reasonably have chosen life

over death as a result of that mitigating evidence. It is simply no answer for a court to punt – as the district court did in this case – and say that because the jury has unbridled discretion in how it considers mitigating evidence a reviewing court can never overturn a jury verdict where to do so would require assessment of the strength of a defendant's mitigating evidence or a comparison of other evidence with the mitigating facts.

The second point is that this statement by the district court illustrates clearly the concerns raised by Mr. Cobb in the district court in his habeas petition. Issues 7, 8 and 9 – namely, that the Texas death penalty scheme makes it difficult, if not impossible, for a reviewing court to provide meaningful appellate review of the jury's decision. If the Court of Appeals agrees with the district court that there is no meaningful way of assessing the jury's decision, then Mr. Cobb would ask the Court to broaden this appeal by certifying for appeal not only Mr. Cobb's Issue 1 but also his Issues 7, 8 and 9 from the district court (Dkt 12) so that he may endeavor to convince this Court that the Texas death penalty regime, which provides no meaningful opportunity to review a jury's decision, is unconstitutional.

## CONCLUSION

While a successful *Brady* claim requires a defendant to demonstrate

"prejudice" from the withheld evidence, Mr. Cobb is not required to show that, but

for the constitutional error, the jury would inevitably have sentenced him to life

imprisonment instead of to death.

> A defendant need not demonstrate that after discounting the inculpatory
> evidence in light of the undisclosed evidence, there would not have been
> enough left to convict. The possibility of an acquittal on a criminal charge
> does not imply an insufficient evidentiary basis to convict. One does not
> show a *Brady* violation by demonstrating that some of the inculpatory
> evidence should have been excluded, but by showing that the favorable
> evidence could reasonably be taken to put the whole case in such a different
> light as to undermine confidence in the verdict.

*Kyles v. Whitley*, 514 U.S. 419, 435 (1995). Crucially, the issue is not whether the

jury's verdict would necessarily have been different. Rather, the issue is whether

given the non-disclosures of material evidence the verdict is less worthy of

confidence. *Morrow v. Dretke*, 367 F.3d 309, 316 (5th Cir. 2004). *See also*

*United States v. Bagley*, 473 U.S. 667, 682 (1985); *Miller v. Dretke*, 431 F.3d 241,

251 (5th Cir. 2005) (citing *Kyles v. Whitley*, 514 U.S. at 433-34).

The testimony of William Elmer Thomsen was the critical piece of evidence

in the jury's determination to sentence Mr. Cobb to death instead of life. The

state's failure to provide the defense with the two letters prior to Thomsen's

testimony prevented an effective cross-examination, deprived Mr. Cobb of his right to a fair trial and so resulted in a verdict that was not "worthy of confidence" in the words of the Supreme Court. *Kyles*, 514 U.S. 419, 434 (1995). As such, it was a classic violation of *Brady v. Maryland.*

The *Brady* violation in this case was so severe that the state courts which previously considered Mr. Cobb's claims acted unreasonably and in clear violation of established federal law by denying Mr. Cobb relief based on this claim. Even under the review standards established under AEDPA Mr. Cobb is entitled to prevail in this appeal. He asks that this Court vacate his conviction and sentence of death because the state withheld material impeaching evidence from the defense.

Respectfully submitted,

/s/ F. Clinton Broden
F. Clinton Broden
Broden & Mickelsen
2600 State Street
Dallas, Texas 75204
214-720-9552
214-720-9594 (facsimile)

/s/ Phillip C. Umphres
Phillip C. Umphres
Law Office of Phillip C. Umphres
2600 State Street
Dallas, Texas 75204
214-999-0035
999-0037(facsimile)

Attorneys for Appellant
Richard Cobb

## <u>CERTIFICATE OF SERVICE</u>

I, F. Clinton Broden, certify that on June 14, 2011, I caused the foregoing document to be served by first class mail, postage prepaid, on Tomee Morgan Heining, Office of the Texas Attorney General, Postconviction Litigation Division, 300 W. 15th Street – 8th Floor, William P. Clemens Building, Austin, Texas 78701-0000.

/s/ F. Clinton Broden
F. Clinton Broden
Counsel for Appellant Richard Cobb

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C) 5th Cir. R. 32.2 and 32.3, the undersigned certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7).

1.      Exclusive of the exempted portions in Fed. R. App. P. 32(a)(7)(B)(iii) and 5th Cir. R. 32.2, the brief contains approximately 12,807 words.

2.      The brief has been prepared in proportionally spaced typeface using Word Perfect 9.0, Times New Roman 14-point type (footnotes in 12-point type).

3.      The undersigned understands a material misrepresentation in completing this certificate, or circumvention of the type-volume limits in Fed. R. App. P. 32 (a)(7), may result in the Court's striking the brief and imposing sanctions against the person signing the brief.

/s/ F. Clinton Broden
F. Clinton Broden
Counsel for Appellant Richard Cobb